GEORGE A. WRIGHT, HAROLD MCGRATH, ROBERT B. WALKER, JR., WILLIAM H. CLARK, FRED TRIMBLE and RUTH C. LAMBORN, on their own behalf and on behalf of each and all other persons similarly situated,

Plaintiffs,

*vs.*

ALBERT B. HUSBANDS, HOWARD F. McCALL and HART COOPER, Directors of the Street and Sewer Department of the City of Wilmington, JAMES F. LIVINGSTONE, Secretary of the Street and Sewer Department of the City of Wilmington, and ARTHUR J. SCOTTON, Clerk of the Market of the City of Wilmington,

Defendants.

*Supreme Court of Delaware, April 25, 1957.*

*Samuel Handloff,* Wilmington, for plaintiffs.

*Januar D. Bove, Jr.,* City Sol., Wilmington, for defendants.

*James R. Morford,* Wilmington, *amicus curiae.*

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

WOLCOTT, *Justice*: A class action was instituted in the Court of Chancery of New Castle County by six individuals, the holders of permits for stalls in the King Street Farmers' and Truckers' Curbstone Market (hereafter King Street Market). Each individual plaintiff holds permits for two stalls in the King Street Market, one on the westerly side of King Street and the other opposite on the easterly side. Each of the plaintiffs has occupied in the King Street Market the particular stalls for which they held permits, or other similar stalls, for a number of years prior to May, 1956.

The defendants are the members of the Street and Sewer Department of the City of Wilmington and other city officials having authority over the streets of Wilmington and the curbstone markets.

On February 21, 1956 and March 13, 1956, the Street and Sewer Department, by two resolutions, eliminated certain stalls in the King Street Market in order to establish loading and unloading zones for the benefit of certain merchants whose store properties abut on King Street. On April 3, 1956, by resolution, the Department ordered the removal of the King Street Market from King Street to the easterly side of French Street, between Second and Ninth Streets.

The individual plaintiffs, as well as all other holders of permits for stalls in the King Street Market made timely application to the clerk of the market in 1956 for a renewal of their permits for stalls in the King Street Market for the year commencing May 1, 1956. These applications were rejected by the clerk of the market pursuant to the resolution of April 3, 1956. Thereupon, the individual permitholders instituted this class action for their own benefit and for the benefit of all of the 170 holders of permits for stalls in the King Street Market. With the consent of the City, an order was entered in the cause restraining the proposed removal of the market, *pendente lite.*

The plaintiffs challenge the authority of the Street and Sewer Department to move the King Street Market from its present loca-

tion on King Street. They rely upon 29 *Del.Laws, Ch.* 135 which, it is contended, fixes until further action by the General Assembly the location of the King Street Market, and thus denies to the City of Wilmington authority to order its removal to a new location. The plaintiffs also challenge the authority of the City to vacate any of the stalls of the King Street Market.

All issues of fact were determined by the Chancellor. Because of the public importance of the questions presented, he certified to this court five questions of law, the answers to which will dispose of the litigation. The five questions certified are as follows:

1. Were the Directors of the Street and Sewer Department of The Mayor and Council of Wilmington ("Directors") authorized by *Vol. 29, Ch.* 135, *Laws of Delaware* ("statute") to enact the resolution of April 3, 1956 moving the King Street Farmers' Market, and the resolutions of February 21, 1956 and March 13, 1956 relating to the establishment of loading and unloading zones?

2. Were the Directors prohibited by the statute from enacting the resolutions set forth in Question No. 1, or any of them?

3. If the statute neither authorized nor prohibited the Directors from passing the resolutions set forth in Question No. 1, or any of them, were the Directors so authorized to pass any or all of such resolutions apart from the provisions of the statute?

4. If said statute be construed to prohibit the Directors from passing some or all of the resolutions identified in Question No. 1, is said statute, to the extent that it may prohibit such action, a violation of the Fourteenth and Fifteenth * amendments to the Constitution of the United States, or a violation of Article I, Sections 7 and 8 and Article II, Section 19 of the Constitution of the State of Delaware, *Del.C.Ann.?*

5. If said statute is unconstitutional, or otherwise invalid, are the resolutions identified in Question No. 1, or any of them, valid?

---

* Reference to the Fifteenth Amendment is an obvious error. It should have been Fifth Amendment.

King Street is one of the ancient streets of Wilmington. It extends from Front Street to Sixteenth Street in a northerly and southerly direction parallel to and east of Market Street. In 1739, the date of the first borough charter of Wilmington, it extended from Front to Seventh (then Broad) Street. In 1772 it extended from Front to Eighth (then Kent) Street. Since 1799, King Street has existed in its present extent.

At no time has the City of Wilmington or its predecessor, the Borough of Wilmington, had any title or estate in or to the bed of King Street. The only evidence of any dedication of the bed of King Street for any purpose consists of a series of plans of city streets, the earliest of which is dated 1736 and accompanies the petition of free-holders of 1739 for a borough charter. At no time since 1736 was King Street a street over which "through traffic" passed as a part or extension of the state highway system. It was and still is primarily a "local traffic" street. It has never been a part of the system of streets and roads maintained and repaired by the state.

French Street runs in a northerly-southerly direction parallel to and east of King Street and is primarily a "through traffic" street and, as such, a part of the system of public streets and roads repaired and maintained by the State Highway Department.

### Questions Nos. 1 and 2

These two questions raise the same basic question, *viz.*, whether or not 29 *Del.Laws, Ch.* 135, prohibits the passage by the Street and Sewer Department of its three resolutions heretofore referred to. We, accordingly, consider them together. The basic question presents a problem of statutory construction only. We are not, accordingly, concerned in our consideration of this phase of the case with any constitutional questions raised by whatever construction is ultimately placed upon 29 *Del.Laws, Ch.* 135. Possible constitutional implications, depending upon the construction of the statute, will be considered under the appropriate questions designedly framed to present them.

The original charter of the Borough of Wilmington of 1739 directed that the existing streets should be continued forever and

empowered the borough authorities to remove all nuisances and encroachments on the streets, and to establish suitable places for the holding of fairs and markets. The original charter specifically directed the borough authorities to provide for the holding of two markets each week throughout the year, one on Wednesday and one on Saturday of each week. There is no record extant fixing the locations at which these original markets were held. However, on the plans of 1736 and 1799 of Wilmington there appears the outline of a market house in the bed of Fourth (then High) Street between Market and Shipley Streets, which parallels Market Street on the west.

In 1809, by 4 *Del.Laws, Ch.* 97 (An Act to Alter and Reestablish the Charter of the Borough of Wilmington), authority was conferred, *inter alia,* upon the borough "to exercise general supervision and establishment of streets and to erect market houses and regulate markets".

In 1852, by 8 *Del.Laws, Ch.* 108, the Borough of Wilmington was transformed into the City of Wilmington with, in general, the same powers previously exercised by the borough, and, in 1883, by 17 *Del.Laws, Ch.* 207, the city charter was revised and authority was conferred upon the Council of the city to regulate the use of the streets and to erect market houses and regulate the markets.

In 1879, by 16 *Del.Laws, Ch.* 122, the General Assembly prohibited the City Council of Wilmington from enacting any ordinance restricting or prohibiting farmers from selling fresh meats or other products raised by them in any street which at any time may be appointed or used as a curbstone market for the sale of farm produce. This act is now found as 22 *Del.C.* § 104 in almost identical language.

In 1885, by 17 *Del.Laws, Ch.* 600, as a supplement to the charter of 1883, the General Assembly authorized the City of Wilmington to establish farmers' and truckers' curbstone markets upon such streets as it should deem proper. In particular, this act provided:

"The public curbstone markets now existing on King and Madison Streets, in the said City of Wilmington, shall be deemed

and taken to be farmers' and truckers' curbstone markets for all the purposes of this act."

In 1887, by 18 *Del.Laws, Ch.* 188, the General Assembly created the Street and Sewer Department as an agency of the City of Wilmington, and conferred upon it the same rights, powers and authority over the streets, etc., as had theretofore been conferred upon the Council of the City of Wilmington.

In 1915, as a preliminary to the erection of the present Public Building in Wilmington on the east side of King Street between Tenth and Eleventh Streets, the General Assembly, by 28 *Del.Laws, Ch.* 123, amended 17 *Del.Laws, Ch.* 600 by the addition of a new section providing that, thereafter, King Street on both sides between Tenth and Eleventh Streets should not thereafter be used for a farmers' and truckers' curbstone market.

In 1917, by 29 *Del.Laws, Ch.* 135, the General Assembly, by "An Act to revise and consolidate the statutes relating to curbstone markets in the City of Wilmington" authorized the Street and Sewer Department to establish upon the streets of Wilmington such public farmers' curbstone markets as the Department in its discretion should deem proper. This act, however, also directed that:

> "The public curbstone markets now existing on King and Madison Streets, in the said City of Wilmington, shall be deemed and taken to be Farmers' and Truckers' Curbstone Markets for all the purposes of this Act, and shall be continued as such under the provisions of this Act, in addition to any additional Farmers' and Truckers' Curbstone Markets that may be established on other streets under the provisions of this Act."

The act of 1917 then prescribed in detail the times for holding of such markets, the sides of King Street on which they should be held at certain designated times, the manner of laying off and designating spaces in the King Street Market, the conditions under which permitholders could use the stalls of the markets, the manner of applying for permits, and the conditions for the reallotment of space in the King Street Market.

The act of 1917 also gave the Street and Sewer Department authority to establish other curbstone markets in Wilmington, subject to the proviso that "all such markets, established and regulated by said Department as provided for in this section, shall be other than farmers' and truckers' curbstone markets and shall at all times be kept separate and distinct from the farmers' and truckers' curbstone markets as designated, described and provided for in the foregoing sections of this Act."

It will have been noted from the foregoing that prior to 1885 the General Assembly delegated general authority to Wilmington to establish and regulate public markets. Apparently, pursuant to this authority, market houses were constructed and regulations adopted for the governance of them, and also, apparently, farmers' curbstone markets were either authorized by ordinance or tacitly permitted to come into existence. We do not have before us, if they are extant, all the ordinances of the city upon the subject, but it clearly appears from an ordinance of March 12, 1860 that both types of markets were at that time in existence since it governs not only market houses but also curbstone markets.

From § 1 of this ordinance, it appears that there were three market houses in existence, one on Fourth Street between Market and Shipley Streets, a second on Fourth Street between Shipley and Orange Streets, and a third on Second Street, presumably in the widened area of that street between Market and King Streets.

By § 4 a curbstone market for the sale of fresh fish was authorized to be held on Wednesdays on the westerly side of King Street between the southerly side of Second and the southerly side of Third Streets.

By § 6 a curbstone market for the sale by farmers of produce and growth of their farms and gardens was authorized. It was provided that horse-drawn wagons could be backed up to the curbstone with the vehicles placed in single rows with their tailboards as near as possible to the curb, in such a way that no horse or vehicle should obstruct the middle line of the street. By this section, this curbstone market was authorized to be held at the following times and locations.:

1. On the easterly side of Market Street on Wednesdays and Saturdays from May 1 to November 1.

2. On the westerly side of Market Street on all market days for the rest of the year.

3. On the westerly side of Market Street on Tuesdays and Fridays from May 1 to November 1.

By § 15 the clerk of the market was directed on the days markets were to be held in the market houses to stretch strong chains across the streets contiguous to the market houses so that the streets in which the market houses were located would be enclosed while the market was being held.

By § 18, the clerk of the market was directed to divide the sidewalk on the northerly side of Fourth Street between Market and Shipley into market stands ten feet in length and thirty inches in width from the curb to the building line, said stands to have passageways between them of three feet.

By § 22 it was required that in each square on both sides of Market Street between Front and Ninth Streets that three spaces or passageways should be kept open for passing between the sidewalks, each space to be three feet in width. One space to be in the middle and the other two equidistant between the middle and the nearest intersection.[1]

By ordinance of January 5, 1883, prior ordinances regulating the markets were repealed and new regulations establishing and governing public markets were ordained.

By § 1 the public markets were located and established on King Street, Madison Street and Fourth Street. It was prescribed that the markets on King Street and Madison Street "shall be used exclusively by farmers and truckers to sell fruits, vegetables, fowl and meats raised upon the lands of which they are the owners". It was directed that the King Street Market should commence at the

---

1. While the extent of the Market Street Curbstone Market is not designated in the ordinance, by implication from § 22 it must have extended at least from Front to Ninth on Market Street.

northerly side of Second Street and extend to the southerly side of Eighth Street. The curbstone markets on King Street were authorized to be held at the following times and locations:

1. From May 1 to November 1 on Wednesdays and Saturdays on the easterly side.

2. From November 1 to May 1 on Wednesdays and Saturdays on the westerly side.

3. From May 1 to November 1 on Tuesdays and Fridays on the easterly side.

4. From November 1 to May 1 on Tuesdays and Fridays on the westerly side.

In the public Markets on King and Madison Streets farmers and truckers were permitted to back up their vehicles to the curbstones.

It is to be noted that the ordinance of 1883 in establishing new locations for the curbstone markets on King and Madison Streets must have had as its prime motive the relief of Market Street from the congestion of the market. Most previously existing provisions remained unchanged. The major change of the ordinance was the location of the curbstone market.

It seems to us of some significance that following the enactment of the ordinance of January 5, 1883 the General Assembly in 1885 enacted 17 *Del.Laws, Ch.* 600 which authorized Wilmington to establish curbstone markets, but which contains a recognition by the General Assembly of the then-existing curbstone markets on King and Madison Streets as such, which two years before had been moved by city action from the former location on Market Street. The significance, it seems to us, lies in the fact that theretofore the General Assembly had seen fit by general delegation of authority to authorize the City of Wilmington in its discretion to establish and regulate markets of all kinds within the city limits. 17 *Del.Laws, Ch.* 600 marks a change in the legislative policy regarding the delegation of authority to Wilmington to establish and regulate markets since it

deals in detail, for the first time, with the allocation of market stalls and the times during which the markets shall be open.

We have noted that the ordinance of January 5, 1883 directed the removal of curbstone markets to King and Madison Streets from the prior location for such markets on Market Street. It is not possible at this time to determine precisely the motives which led to the change in legislative policy and the passage of the act of 1885, but it is a reasonable conclusion that the removal of a farmers' market of long standing from Market Street to a new location disturbed the members of the General Assembly and led to the decision to take from Wilmington the broad power to regulate and establish markets which had theretofore been granted it and, in effect, to determine for all time, or until the further order of the General Assembly, the location of such markets.

It was apparently thought by both the city authorities and the General Assembly that such was the result of the act of 1885 since, in 1915, when the necessity arose to vacate a portion of the King Street Market in order to erect the present Public Building in Wilmington an act, 28 *Del.Laws, Ch.* 123, was passed by the General Assembly authorizing the vacating of such a market. Even if it is conceded that a construction of the act of 1885 that it took from Wilmington the power to move the King Street Market to a new location, is debatable—the conclusion is almost forced by the passage of the 1915 act that it was regarded by all concerned as having done so. This conclusion flows from the passage of the act for, impliedly at least, its very passage admits the necessity for legislative action to vacate a portion of the market. The force of the implication is not avoided by characterizing the act as an anomaly, as does the *amicus curiae*.

If any doubt remained after 1885, however, it was removed by 29 *Del.Laws, Ch.* 135 revising and consolidating the statutory law relating to curbstone markets. This act for the first time specifically directed that the existing King Street Market "shall be continued as such". Furthermore, the incorporation in the act of detailed provisions concerning the regulation of the markets makes it clear that the

General Assembly not only intended to fix the locations of such markets, but also intended to reserve to itself the control of such markets, with the exception of a very limited authority that the city was permitted to retain.

The statute requires the Street and Sewer Department during April of each year to lay off stalls on both sides of the streets to be used for curbstone markets, fixes the size of such spaces and prescribes in detail the manner and terms under which allocation of such stalls shall be made for the ensuing year. Specific directions are made to the effect that the market on King Street shall be held during certain periods of the year on the easterly side of the street on Wednesday and Saturday of each week, and during another period of the year shall be held on Wednesday and Saturday on the Westerly side, with comparable provisions for holding the market on Tuesday and Friday of each week. The detailed provisions and restrictions on the holding of the King Street Market, and the specific direction for its continuance as such, clearly militate against the contention of the City and *amicus curiae* to the effect that 29 *Del.Laws, Ch.* 135 is nothing more than a general grant of authority to the city to regulate curbstone markets.

A further answer to the contention that the statute is merely a general delegation of authority is found in the provisions of § 9. This section provides that the city shall have authority to establish and regulate "such other public curbstone markets" as it shall deem proper "in addition to the Farmers' and Truckers' Curbstone Markets hereinbefore provided for", and further provides that such additional markets established by the city "shall be other than Farmers' and Truckers' Curbstone Markets and shall, at all times, be kept separate and distinct from the Farmers' and Truckers' Curbstone Markets as designated, described and provided for in the foregoing sections of this act". Since § 9 obviously is a general delegation of authority to the city to establish and regulate markets other than farmers' curbstone markets as the city in its discretion shall determine, it follows that the preceding sections of the statute relating in detail to the location and regulation of farmers' curbstone markets in effect set them apart as a special class of markets not subject to the broad authority

delegated by § 9. If this were not the result intended, the bulk of the statute dealing specifically with the farmers' curbstone markets would be entirely superfluous.

In our opinion, therefore, the referred to provisions of 29 *Del.Laws, Ch.* 135 relating in detail as they do to the establishment and regulation of the curbstone markets on King and Madison Streets, together with the authority delegated to the city to provide for other curbstone markets which shall be kept separate and apart from the King and Madison Street Markets clearly indicate that it was the intention of the General Assembly to establish the King Street Market at its then location; and to prohibit its abolition or removal to a new location except with the consent of the General Assembly expressed by legislative enactment.

This conclusion necessarily means, therefore, that the resolution of April 3, 1956 requiring the removal of the King Street Market to French Street was enacted against the requirement of 29 *Del.Laws, Ch.* 135 that the King Street Market shall remain as a curbstone market on that street.

With respect to the resolutions of February 21, 1956 and March 13, 1956 establishing loading and unloading zones on King Street for the benefit of merchants whose properties abut upon the area occupied by the farmers' curbstone market, a different situation is presented.

The City argues that the authority contained in § 2 of *29 Del. Laws, Ch.* 135 directing it in April of each year to lay off and designate stalls on both sides of King Street impliedly authorizes the city to vacate such number of stalls on said street as shall be required to permit access to the properties of abutting merchants on King Street.

The argument is based primarily upon the general police powers of a municipality in the regulation of the use of its streets to provide for the health and safety of the inhabitants, and to arrange for the orderly flow of traffic. A municipality, however, has no inherent police power but has only such power as shall be delegated to it by the General Assembly. Such power exists only when delegated

by the state, and in that event only to the extent delegated. 6 McQuillin, *Municipal Corporations* (*3rd Ed.*), § 24.46.

The City argues, however, that there has been a delegation of very broad police power to regulate the use of the streets to the Street and Sewer Department by 18 *Del.Laws, Ch.* 188, which gave that department entire jurisdiction and control of the streets of Wilmington. It is to be noted, however, that curbstone markets or, indeed, markets of any kind, are not specifically included within the delegation of authority made by 18 *Del.Laws, Ch.* 188. Furthermore, the statute must be put in its proper perspective. In effect, it merely substituted a new department of the city for the exercise of certain powers theretofore exercised by the City Council. It was enacted in 1887, two years after the passage of the first statute relating in detail to the curbstone markets of Wilmington. The City concedes that 18 *Del.Laws, Ch.* 188 did not effect any change in the law relating to curbstone markets, and that it is not inconsistent with the prior curbstone market law as embodied in 17 *Del.Laws, Ch.* 600.

Under these circumstances, we think our discussion heretofore of the effect of the passage of 17 *Del.Laws,* Ch. 600 has equal application to the authority of the Street and Sewer Department over the regulation and control of markets. We think also our discussion of subsequent statutes, culminating in 29 *Del. Laws, Ch.* 135, has equal pertinency. The Street and Sewer Department is subject to the same limitations and restrictions on the exercise of its power. Furthermore, if it can be held that at one time the Department had been delegated sufficient power to order the removal of the King Street Market, nevertheless, that authority was taken away by 29 *Del.Laws, Ch.* 135 which, being later in origin and repugnant and inconsistent with the existence of such authority in the Street and Sewer Department, would necessarily prevail as the latest expression of will of the General Assembly. *Mayor and Council of Wilmington v. State ex rel. DuPont*, 5 *Terry* 332, 57 *A.2d* 70, and *cf. Taylor v. Smith*, 13 *Del.Ch.* 57, 115 *A.* 413.

It is necessary, however, if it is possible to do so, to construe both statutes so as to remove any inconsistency or repugnancy.

Admittedly, the Street and Sewer Deuartment has broad police powers generally over the streets, and some limited authority, at least, over the King Street Market. The power, however, we think is clearly limited by 29 *Del.Laws, Ch.* 135 in so far as it conflicts with the legislative requirement that the King Street Market be continued as such.

■ Any authority, therefore, that the Department has over the curbstone markets must be found, if at all, in 29 *Del.Laws, Ch.* 135 itself. The City points to the authority to lay off market stalls annually as the source of the Department's authority to vacate stalls in order to create loading zones. We agree that the direction to lay out stalls annually in the King Street Market would permit the vacation of former stalls for the purpose of, for example, protection against fire by the installation of fire plugs and for the purpose of dealing with similar situations. A vacation of a stall for such a purpose would be a proper exercise of delegated police power by the city for the protection of the public. If this were not the result, we would be forced to ascribe to the General Assembly an intention for all time to prevent the city from affording adequate fire protection to its inhabitants.

We think, however, that the delegated power goes no further, since the right to vacate, if it is unlimited and exercisable for any purpose, could quite obviously be used to destroy the existence of the King Street Market which the General Assembly clearly intended to preserve. It seems clear to us, therefore, that the delegation of authority to vacate stalls is necessarily limited in purpose, *viz.,* the necessity of acquiring the particular space for the general welfare of the people of Wilmington.

It is obvious that the establishment of loading and unloading zones for the benefit of particular merchants whose businesses are located on King Street does not fall within the broad category of public purpose. Such zones are for the benefit of individual property owners only—a purpose prohibited by 29 *Del.Laws, Ch.* 135.

The *amicus curiae* argues that the general history of the legislative enactments and the various ordinances of the City of Wilmington

referred to above indicate that the General Assembly only intended to pass enabling legislation delegating general authority to Wilmington to regulate markets including the establishment of their locations. We think that what we have said heretofore indicates that such is not the fact. The various specific provisions relating in detail to the establishment and operation of the markets preclude the acceptance of the contention. The acceptance of the contention would require the emasculation of these detailed provisions in order to confer upon the city broad and unlimited power over the curbstone markets.

The resulting situation—that is, the establishment by statute of public curbstone markets in specific locations in a municipality of the size of Wilmington—is deplorable. We must, however, take the law as we find it. We would be overstepping the bounds of judicial authority if we permitted our own conception of the modern use of city streets and our sympathy with the frustration of the city officials, and the harassment of the city merchants to lead us into the error of judicially legislating out of existence a statute of the General Assembly the meaning of which we think is clear. The temptation to do so is great, but the repeal of an existing statute may come only from the General Assembly.

It follows, therefore, that the answer to be given Question No. 1 must be in the negative and that the answer to be given Question No. 2, must be in the affirmative.

### Question No. 3

Our answers to Questions Nos. 1 and 2 make it inappropriate to formulate an answer to Question No. 3 for the reason that it is based on a hypothesis we have already discarded by our finding that 29 *Del.Laws, Ch.* 135 in fact prohibited the passage by the Street and Sewer Department of the three resolutions in question.

### Question No. 4.

In their arguments under Question No. 4, the City and the *amicus curiae* attack the constitutionality of 29 *Del.Laws, Ch.* 135, upon two major premises. The first is based upon the contention

that it violates the 5th and 14th Amendments to the Federal Constitution and Article I, § 7 and § 8 of the Constitution of Delaware in that the preemption by the statute of a part of the bed of King Street for a curbstone market is a taking of private property without compensation and without due process of law. The second is that the enactment of 29 *Del.Laws, Ch.* 135 is a violation of Article II, § 19 of the Constitution of Delaware. We will consider first the second ground of unconstitutionality urged.

Article II, § 19 of the Delaware Constitution provides in pertinent part as follows:

> "The General Assembly shall not pass any local or special law relating to * * * the laying out, opening, alteration, maintenance or vacation, in whole or in part of any road, highway, street, lane or alley; provided, however, that the General Assembly may by a vote of two-thirds of all the members elected to each House pass laws relating to the laying out, opening, alteration or maintenance of any road or highway which forms a continuous road or highway extending through at least a portion of the three counties of the State."

The City contends that 29 *Del.Laws, Ch.* 135 is a local or special law, as indeed are all legislative enactments relating to specific municipalities. We do not understand the plaintiffs to take issue with this contention. Nor do we doubt that it is in fact a special law. Cf. *Clendaniel v. Conrad*, 3 *Boyce* 549, 83 *A.* 1036. The proviso in the section was adopted by way of amendment in 1912 but, in any event, it has no application to the present inquiry because of the factual finding that King Street is a local street and, as such, not a part of "a continuous road or highway extending through at least a portion of the three counties of the State."

The argument of the City in this respect is that the statute advances the private interests of persons having stalls in the King Street Market and, in so doing, interferes with the "maintenance" by the city of King Street in that it prohibits the city from providing for an orderly flow of traffic, and adequate police and fire protection, and thus prevents the continued existence of King Street as a part of a

system of local streets for public use. The statute, therefore, says the City, is contrary to the fundamental purpose of the prohibition contained in Article II, § 19.

The City cites a number of authorities from other jurisdictions defining the word "maintenance" as embracing not only the manual task of the repair of existing roads and streets, but also the performing of every act necessarily and appropriately connected with and incident to the laying out, opening, construction, repair, regulation, operation and use of an efficient road or street system. Therefore, it is argued, since the operation of the King Street Market interferes with the most efficient use of King Street as a street for the flow of traffic, it is an interference with its "maintenance" as a street.

Similarly, the City argues that the King Street Market is an "alteration" of the use of King Street to private interests and thus falls within the constitutional ban. We are of the opinion, however, that the attempt to label the directed use of King Street as a market as an "alteration" of the street is of little persuasion.

Fundamentally, the argument is that the statutory requirement that King Street be used for market purposes so interferes with the flow of traffic, parking and safety of the public that it falls within the ban of Article II, § 19 which was specifically designed to prevent such legislation.

We do not think that judicial definitions of "maintenance" and "alteration" will supply the answer, for the reason that such definitions run the gamut from the narrowness of physical repairs to the all-embracing definitions cited by the City. It is apparent, for example, from only cursory examination of the many judicial definitions set out in *Words and Phrases* under the title "Maintenance" that the word is defined almost without exception in the light of the circumstances of the particular case and of the purpose lying behind the legislative enactment.

We think the meaning of Article II, § 19 is therefore to be derived from the purpose for which it was included by the Convention of 1897, for there is no comparable provision to be found in the Constitution of 1831 which was superceded by our present Constitution.

From the Debates of the Constitutional Convention of 1897 the underlying reason for the prohibitions against the passage of special laws relative to streets is made clear. The debates on the subject are to be found between pages 6006 and 6015. It appears that the intention was to prevent the flood of special bills relating to the physical laying out or altering of roads and streets, and the consequent demands upon the time of the General Assembly upon matters with which the members could not be or become familiar. The underlying reason is clearly set forth in the following remarks of Mr. Spruance, one of the delegates:

"As a general rule, * * * it is properly the province of that local government [municipality] to have charge of and to regulate the details concerning the opening, alteration and maintenance of streets and highways in the locality. Yet, notwithstanding that, the Legislature undertakes to exercise supervision in such matters. We have at this time an instance of this pending in the Legislature in the case of a proposition to close a street. I do not know anything about the merits of that case, but will you tell me what the Legislature knows about it? Ought they to deal with it or ought the City Government of Wilmington to deal with it? That is the point. Now, they deal with all matters pertaining to the opening and grading of streets and so on, and the people of the locality affected afterwards pay the money through taxation, in all such cases. Persons are in the habit of coming down here to the Legislature to get a street closed or altered or vacated or whatever else they want to have done with it. Such a practice is one that, to my mind, is utterly indefensible."

Mr. Saulsbury, another of the delegates, had the following to say:

"The Section also provides against Legislation for the laying out, opening, alteration, maintenance or vacation, in whole or in part of any road, highway, street, lane or alley. Bills are constantly being presented to the Legislature to provide for laying out public roads or changing the course of certain public roads in the different counties, and those roads take up a great deal of time of the Legislature."

■ Following the debate on the section, it was unanimously approved by the Convention. It is quite apparent that the particular provision was designed to prohibit special laws relating to physical changes in existing roads and streets with which each session of the General Assembly had, up to that time, been plagued. Almost any volume of Session Laws picked at random will demonstrate the fact. For example, it appears from 17 *Del.Laws* that twenty-three special acts relating to vacating, straightening, altering, widening, changing the course, and laying out roads and streets in various localities in the counties and municipalities of the state, were passed by the 1883 session of the General Assembly, *Chapters* 119-142.

It is quite apparent, therefore, that the provision of the Constitution now under consideration was enacted to prevent a specific evil, and that this evil was the flood of special acts relating to changes in physical characteristics of streets and roads. Furthermore, so regarded the use of the word "maintenance" in *Section* 19 harmonizes with a great many judicial definitions of the word. Therefore, considering the constitutional provision in the light of the circumstances which led to its adoption, and the evil it was designed to prevent, we are of the opinion that *Article* II, § 19 prohibits only the enactment of special laws relating to physical changes in streets and roads.

It follows, therefore, that 29 *Del.Laws, Ch.* 135 is not unconstitutional as a violation of *Article* II, § 19 of the *Delaware Constitution.*

■ The second phase of the argument upon Question No. 4 is that 29 *Del.Laws, Ch.* 135 is a taking of property, without compensation and without due process of law, and is, therefore, violative of the applicable provisions of the Federal and Delaware Constitutions. The argument is advanced by the *amicus curiae.*

In his brief, the *amicus curiae* recites the factual background upon which the argument is based to be: that Wilmington has no title in fee to the bed of King Street between building lines; that in 1736 the bed of King Street was dedicated as a public street; that the fee simple title to the bed of King Street, subject to a public easement for highway purposes, is now in the heirs of the 1736 petitioning ,freeholders; and that the earliest evidence of the use of the bed of

King Street as a market is the ordinance of 1860 authorizing stalls for fish vendors between Second and Third Streets.

One additional fact has been omitted. The ordinance of 1860 deals in detail with a curbstone market on Market Street from Front to Ninth Streets. Furthermore, we have grave doubt that the ordinance of 1860 created the markets regulated by it. While the evidence is silent, we think it probably clear from the ordinance itself that it was a regulation of previously existing markets, probably of long standing. Indeed, the very name "Market" of the street on which the curbstone market existed in 1860 indicates that conclusion as the probability.

The *amicus curiae* also states that the King Street Market was created by the ordinance of 1883. In a sense, this is accurate but it would be a more accurate statement to say that the market on Market Street was moved to a new location on King Street as a result of the ordinance of 1883. If the *amicus curiae* intended to suggest that it was not until 1883 that a farmers' curbstone market came into being in Wilmington, the suggestion is erroneous.

Based upon the proposition that the General Assembly in the exercise of its legislative power is limited by the inhibitions of the Federal and Delaware Constitutions against taking private property for a "non-public" purpose, without compensation, and without due process of law, the *amicus curiae* argues that the General Assembly cannot itself, or by delegation of authority to the City of Wilmington, license a class of private persons to use the bed of King Street for the purpose of selling merchandise of any description.

If we follow the argument correctly, its starting point is the supposed creation in 1736 by the petition of the freeholders of Wilmington of an unrestricted public easement for the use of the streets of Wilmington for public highways. Assuming that there was a dedication of the bed of the public streets in 1736 and the resultant creation of an easement in the public, which seems probable, it nevertheless does not follow that such easement was as unrestricted as the *amicus curiae* contends. The petition for a borough charter also petitioned for certain borough powers among which was the authority "to keep

markets on such days as shall be thought convenient". The additional fact that on the plot of streets, which *amicus curiae* argues constituted the dedication to the public of the bed of the streets, one of the streets is labeled "Market Street", by implication at least raises the presumption that street or curbstone markets were then in existence in Wilmington, probably on Market Street. This presumption is strengthened by the historical fact that public markets, held in the streets, were of common occurrence in Delaware in Colonial and Nineteenth Century times. Indeed, their existence was not unique to Delaware but may be traced back to England from whence came many of our customs.

It follows, therefore, that the easement in the public to the use of the streets of Wilmington created by the dedication of 1736 was restricted by the authority of the borough to establish public markets in those streets. There has never been, therefore, any right in the public to the unrestricted use of those streets for highway purposes, certainly at least with respect to those streets laid out originally and dedicated to the public.

The argument that the establishment of curbstone markets is the use of public streets for non-public purposes finds its answer in the fact that for centuries the establishment of food and other markets in communities has always been the concern of the public authorities and was considered to be, primarily, for the benefit of the public. The fact that incidental benefit may flow to the individuals holding stall permits does not detract from the general public purpose to provide a place where residents may buy food.

Finally, the *amicus curiae* argues that 17 *Del.Laws, Ch.* 135 sets up an arbitrary, unreasonable and capricious classification and thus violates the equal protection clause of the 14th Amendment of the Federal Constitution. We have difficulty in following the argument. Within the class upon which it operates, *i.e.*, farmers, there is no discrimination—all are treated alike. Furthermore, it hardly seems unreasonable to us to limit the granting of stalls in a market for the sale of farm and truck produce to the farmers who raise the products to be sold in the market.

We are, therefore, of the opinion that 17 *Del.Laws, Ch.* 135 is not unconstitutional as a violation of the inhibitions of the 5th and 14th Amendments of the Federal Constitution.

It follows, therefore, that the answer to Question No. 4 must be in the negative.

### Question No. 5.

Our answers to Questions Nos. 1, 2 and 4 having removed the hypothesis upon which Question No. 5 is based make it inappropriate for us to frame an answer to that question.