## OPINION OF THE JUSTICES.

Supreme Court of Delaware.

Jan. 2, 1981.

To His Excellency Pierre S. du Pont,
Governor of Delaware:

Reference is made to your letters, dated December 4 and December 11, 1980, requesting an opinion of the Justices of the Supreme Court of Delaware, under 10 *Del.C.* § 141[1] upon two questions. You note that, after the conclusion of appellate action by the United States Supreme Court on June 9, 1980 in the litigation styled *Evans v. Buchanan*, the 130th General Assembly of the State of Delaware enacted legislation, 62 *Del.Laws* c. 351, the School District Reorganization Act (1980 Act), which vested the State Board of Education with the authority to divide the judicially-created New Castle County School District. The legislation was signed by you on July 8, 1980. With regard to such legislation, you ask the opinion of the Justices on the following questions:

*Question No. 1*

"Does all or part of 62 *Del.Laws* c. 351 constitute an impermissible delegation of legislatjve power to the State Board of Education under *Del.Const.* Art. II § 1?"

*Question No. 2*

"Does all or part of 62 *Del.Laws* c. 351 constitute the enactment of an impermissible local or special law creating or changing the boundaries of a school district under *Del.Const.* Art. II § 19?"

Following receipt of your request, counsel in the *Evans* case voluntarily participated in taking adversary positions upon the questions presented by your request. As to Question No. 1, Irving Morris, Esquire and Joseph A. Rosenthal, Esquire took the affirmative position and The Honorable Richard S. Gebelein, Attorney General, Mason E. Turner, Esquire and Roger A. Akin, Esquire took the negative position. As to Question No. 2, Henry N. Herndon, Jr., Esquire and Edward N. McNally, Esquire took the affirmative position and Messrs. Gebelein, Turner and Akin again took the negative position. Opening and reply memoranda were exchanged on December 16, 1980 and December 19, 1980, respectively, and oral argument was had before the Justices on December 22, 1980. The Justices are most appreciative of the most valuable and expeditious assistance rendered by counsel in this matter.

Initially, we note the strong judicial tradition in Delaware in support of a presumption of the constitutionality of a legislative enactment. This tradition is perhaps most comprehensively described in the following

---

1. 10 *Del.C.* § 141(a) provides:
"The Justices of the Supreme Court, whenever the Governor of this State may require it for public information, or to enable him to discharge the duties of his office with fidelity, may give him their opinions in writing touching the proper construction of any provision in the Constitution of this State, or of the United States, or the constitutionality of any law enacted by the General Assembly of this State or the constitutionality of any proposed constitu-

tional amendment which shall have been first agreed to by two thirds of all members elected to each house."
Your Excellency's letter dated December 11, 1980 establishes a need for the opinion due to present constitutional duties awaiting performance by the Governor. *In re Opinions of the Justices*, Del.Supr., 88 A.2d 128, 130–31 (1952); *Opinion of the Justices*, Del.Supr., 200 A.2d 570, 572 (1964).

language from *Justice v. Gatchell*, Del. Supr., 325 A.2d 97, 102 (1974).

"[W]e become mindful of the traditional self-restraint of this Court whenever it becomes engaged in testing the constitutionality of an act of the General Assembly. Such self-imposed limitation has been expressed by this Court in varying but consonant terms: Legislative acts should not be disturbed except in clear cases, and then only upon weighty considerations; a legislative enactment is cloaked with a presumption of constitutionality and should not be declared invalid unless its invalidity is beyond doubt. *Klein v. National Pressure Cooker Co.*, Del.Supr., 31 Del.Ch. 459, 64 A.2d 529 (1949). Every presumption is in favor of the validity of a legislative act and all doubts are resolved in its favor; and if the question of the reasonable necessity for regulation is fairly debatable, legislative judgment must be allowed to control. *State v. Hobson*, Del.Supr., 7 Terry 381, 83 A.2d 846 (1951). There is a strong presumption of constitutionality attending a legislative enactment which, unless the evidence of unconstitutionality is clear and convincing, the court will be reluctant to ignore. *State Highway Dept. v. Delaware Power & Light Co.*, Del.Supr., 39 Del.Ch. 467, 167 A.2d 27 (1961). One who challenges the constitutionality of a statute has the burden of overcoming the presumption of its validity. *State v. Brown*, Del.Supr., 195 A.2d 379 (1963)."

On the two questions presented, impermissible delegation and impermissible local or special law, there is no reason why the presumption of constitutionality should not operate fully in the case of doubt.

With regard to Question No. 1, it should be noted that an opinion of the Justices was rendered in 1968 with regard to the delegation of power to reorganize school districts given to the State Board of Education by the Educational Advancement Act of 1968, 56 *Del.Laws* c. 292 (1968 Act).[2] The Justices opined that the act was "not an improper delegation of legislative power to the State Board of Education for the reason that it fixes the general principles and standards which are to control the Board in its exercise of discretion." *In re Opinion of the Justices*, Del.Supr., 246 A.2d 90, 94 (1968). In that opinion, the Justices relied on the general purpose of the law,[3] the direction to the State Board of Education to adopt specific criteria,[4] and the prohibition from adopting any plan which failed to meet certain minimum requirements.[5] Both sides in the instant presentation appear of the view that the Justices' conclusion in that case is unassailable.

In 1978 a new school reorganization act, the School District Reorganization Act of 1978, was passed, 61 *Del.Laws* c. 210 (1978 Act). The Legislation to which Your Excellency's inquiry is directed is a 1980 enactment amending the 1978 Act. The effect of the amendment is to alter the mechanism for school district reorganization. Neither

---

**2.** Article II, § 1 of the Constitution of 1897 provides: "The legislative power of this State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives."

**3.** The general purpose was "to provide for the reorganization of existing school districts by the retention of some existing districts and the combination of others in accordance with the policies, procedures, standards and criteria established by the Act." *Id.*

**4.** The State Board of Education was directed to take into account "topography, pupil population, community characteristics, transportation of pupils, use of existing school facilities, existing school districts, potential population

changes and the capability of providing an effective education." *Id.*

**5.** The minimum requirements were "(a) the requirement that each district shall offer an instructional program for twelve grades; (b) the fixing of minimum and maximum pupil population of reorganized districts; (c) the prohibition against combining other than whole existing districts and against the subdividing of existing school districts; (d) the establishment of the City of Wilmington as a reorganized school district; (e) the prohibition against the consolidation of an existing district with 1900 pupils in twelve grades with an area of over 100 square miles, and (f) the exclusion of a district from consolidation which operates cooperatively with a school district of another state." *Id.*

the 1978 Act or the 1980 Act set forth the specific criteria and the minimum requirements that were enumerated in the 1968 Act. Indeed, the 1978 Act struck the entire pre-existing Subchapter on reorganization of districts. *Id.* at § 1. It is the absence of standards which gives rise to the current attack of impermissible delegation and our response to Your Excellency's first question will be given in that context.

Two things should be noted preliminarily. The first is that some tension exists between Article II, § 1 and Article II, § 19. To the extent that the General Assembly is prohibited from passing "any local or special law relating to ... the creation or changing the boundaries of school districts", some non-legislative mechanism must be contemplated. Second, it is important to note that both the 1978 Act and the 1980 Act were triggered by the pendency of *Evans v. Buchanan* in the United States District Court and particularly the order of that court dated January 9, 1978 which judicially created one school district comprising all of New Castle County except for the Appoquinimink School District and a portion of the Smyrna School District to replace the eleven pre-existing school districts. Any attempt to opine on the questions submitted by Your Excellency must consider the problem created by the extraordinarily large district and the corollary factual context of the legislation which is apparent from the face of the 1978 and 1980 Acts.[6]

"[T]o avoid an unlawful delegation of legislative power, a statute must establish adequate standards and guidelines for the administration of the declared legislative policy and for the guidance and limitation of those in whom discretion has been vested; this to the end that there may be safeguards against arbitrary and capricious action, and to assure reasonable uniformity in the operation of the law." *Marta v. Sullivan*, Del.Supr., 248 A.2d 608, 609 (1968). We particularly note that our 1968 opinion previously cited, in its reliance on the specific provisions of the 1968 Act, did not establish those provisions as prerequisites to pass constitutional muster. Rather, the Court was merely giving its opinion on the particular legislation on which the question was submitted. Similarly, in this instance, we must judge whether "adequate standards and guidelines" have been established. It was explicitly the purpose of the General Assembly to do so. 14 *Del.C.* § 1001(b). We are satisfied that such standards have been established.

▪ Three standards are quite specific. First, as noted above, it is clear from the face of the 1980 Act, and its reference to "any school district created by order of a federal court", that the overwhelming consideration was the adoption of a plan that would satisfy the constitutional demands of the United States District Court and all that that implies. In particular, the plan must adequately desegregate the student body. Reference to the preamble of the 1978 Act reinforces this overriding concern as does the explicit authority to ignore pre-existing school district lines contained in 14 *Del.C.* § 1003(2). Second, the General Assembly had an overriding and explicit concern "to preserve the historic concept of semi-autonomous locally controlled school districts throughout the State" and "to continue the statewide process of reorganization of school districts begun under the School District Reorganization Act of

---

6. The 1978 Act has an extensive preamble of "WHEREAS" clauses and both Acts are directed to reorganization of school districts subject to an order of the United States District Court. In particular, the 1980 Act permits "the State Board of Education [to] divide any school district created by order of a federal court". We also note that the United States Court of Appeals for the Third Circuit "invited, nay, urged, [state authorities] to come forward with meaningful solutions to this vexing problem, solutions that will achieve the same objectives to the court ordered plan." *Evans v. Buchanan*, 3d Cir., 582 F.2d 750, 781 (1978). Similarly, the Federal District Court Judge has noted that the "operation of public schools is traditionally a matter of local concern, and properly so." *Evans v. Buchanan*, D.Del., 416 F.Supp. 328, 365 (1978).

1968".[7]  14 *Del.C.* § 1001(a).  In short, the General Assembly clearly said the court-created district, almost nine times the next largest district in our State in student population, is an aberration and should be eliminated consistent with constitutional standards and, to the extent possible, consistent with established state policy as had been set forth in the Educational Advancement Act of 1968.  Third, the General Assembly explicitly stated that a reorganized district must provide a complete instructional program for grades 1 through 12.  14 *Del.C.* § 1003(1).  This particular requirement of the 1968 Act thus remained inviolate.

■  While it is true that the clear standards just noted are general in nature and not as detailed as those set forth in the 1968 Act, the intent is obvious.  The State Board of Education was to have the flexibility to create smaller, locally controlled districts, satisfying any constitutional demands and conforming as consistently as possible with existing statewide educational policy including the policy that each district must contain twelve grades.  It is certainly reasonable to surmise that the General Assembly was fearful that too specific detail would run afoul of the constitutional determinations of the federal court.  Experience had indeed demonstrated the need for caution.  Moreover, the General Assembly was operating in an area where it is prohibited by the State Constitution from fixing the lines.  In light of the context and the clear general standards, we find no impermissible delegation of legislative power.  If there be doubt as to this conclusion, and we find none, the presumption of the constitutionality of a legislative enactment, insofar as permissible delegation is concerned, would be entitled to special weight in this extraordinary situation of a General Assembly attempting to comply with federal court direction.

Question No. 1 is answered in the negative.

Directing our attention to Question No. 2, whether the legislation in question is impermissible under Article II, § 19, we find even less constitutional concern.  The pertinent constitutional provision reads as follows:

"The General Assembly shall not pass any local or special law relating to . . . the creation or changing the boundaries of school districts . . . ."

■  It is always appropriate, of course, to examine the challenged legislation in light of the purposes that Article II, § 19 was enacted to accomplish.  See *Wright v. Husbands*, Del.Supr., 131 A.2d 322, 332 (1957).[8]  In a nutshell, Article II, § 19, with respect to school districts (as well as fences, straying livestock, ditches, roads and alleys), was designed to prevent the legislature from wasting time and expense on trivial changes in school district boundaries that were sought by private parties for their personal benefit.  3 Debates and Proceedings of the Constitutional Convention of the State of Delaware 2261–63 (1958) (Constitutional Debates).

■  Quite obviously, the 1980 Act cannot be described by the language above.  It is a considered legislative response to the judicial invitation given in the *Evans* opinions [*Evans v. Buchanan*, D.Del., 416 F.Supp. 328, 351–54, 357 (1976), aff'd as modified, 3d Cir., 555 F.2d 373 (1977), *stay denied*, 439 U.S. 1360, 99 S.Ct. 28, 58 L.Ed.2d 69 (1978); *Evans v. Buchanan*, 3d Cir., 582 F.2d 750, 781 (1978), aff'g D.Del., 447 F.Supp. 982 (1978), *cert. denied sub. nom., Delaware State Board of Education v. Evans*, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980)], a topic of intense statewide public interest for the last few years.  The legislation is therefore neither trivial nor private; accordingly, it is not, we believe, of the nature that Article II, § 19 was intended to prohibit.

■  In addition to the far-reaching and non-trivial effects of the 1980 Act, the Gen-

---

7.  The reference should have been to the Educational Advancement Act.  56 *Del.Laws* c. 292, § 41.

8.  We have made similar inquiries before, see e. g., *Opinion of the Justices*, Del.Supr., 252 A.2d 164 (1969); *Tusso v. Smith*, Del.Supr., 162 A.2d 185 (1960), and our conclusion today is consistent with those decisions.

eral Assembly itself is not creating or changing the school district boundaries. Compare *Opinion of the Justices*, Del.Supr., 252 A.2d 164 (1969). All boundary changes will be made by the State Board of Education, not the General Assembly. 62 *Del. Laws* c. 351, § 1. This distinction is crucial, for as the constitutional debates clearly disclose, the framers were entirely content with the idea of, and indeed suggested, that "some department of the government" rather than the General Assembly itself be responsible for such matters. 3 Constitutional Debates at 2261. Apparently, one of the prime evils feared by the framers was that, in the absence of Article II, § 19, the General Assembly would waste its time on inappropriate matters.[9] *Id.* at 2261–63. See also *Tusso v. Smith*, Del.Supr., 162 A.2d 185, 186 (1960) citing *Wright v. Husbands*, Del.Supr., 131 A.2d 322, 333 (1957) (Both cases dealing with the road and street portion of Article II, § 19). No legislative time is lost when the State Board of Education addresses reorganization problems. Therefore, any reading of Article II, § 19, that interprets the "relating to" language therein to encompass a prohibition against authorizing the State Board of Education to reorganize school districts is too broad and flies in the face of the unequivocally expressed intent of the Constitution's framers.

■ Even if we assume that the 1980 Act relates to the creation or changing the boundaries of school districts by the General Assembly, we are not of the opinion that the 1980 Act, in the context of Title 14, is a local or special law. This situation is entirely different from the typical school district line-drawing case such as the Dickinson School District case previously considered by the Justices. *Opinion of the Justices*, Del.Supr., 252 A.2d 164 (1969). In this case, a pattern of statewide school organization was disrupted by an external force, the constitutional mandate of the federal court. While that disruption may be considered both socially benevolent and constitutionally required, it was, as the United States District Court itself has recognized, a disruption to an established state policy favoring locally controlled school districts.

Far from being a local or special law, the 1980 Act in the context of Title 14 is designed, to an extent permissible, to permit the reestablishment of a general "statewide" policy. 62 Del.Laws c. 351, § 2 (1980), incorporating 14 *Del.C.* § 1001 as enacted in 1978.[10]

In this context, as a thread in a statewide cloth of reorganization begun in 1968, the 1980 Act cannot be described as local or special. Furthermore, the actual statistics surrounding this dispute support the conclusion that the 1980 Act is neither local nor special. The Act addresses the judicially-created New Castle County School District, New Castle being the State's largest county by far in student population. Indeed, over half of Delaware's public school students attend school in the New Castle County School District.

In *Tusso v. Smith*, Del.Supr., 162 A.2d 185 (1960), addressing the roads and streets portion of Article II, § 19, we decided that the statewide ramifications of an interstate highway located solely in a *portion* of *northern* New Castle County could not be termed "local" or "special". Because the highway would be an integral part of the Delaware State highway system, it was "not solely a matter of local concern", *id.* at 187, for the residents surrounding its immediate location. This analysis applies to the issue before us as well. The 1980 Act is an integral part of the statewide reorganization plan, and, as such, cannot be characterized as a local or special law.

---

**9.** Another reason for Article II, § 19 was to prevent someone with "an ax to grind . . . to get through the Legislature measures that ought not to be enacted." 3 Constitutional Debates at 2262. In this connection, the inclusion of school district lines with fences, straying livestock, ditches, roads and alleys is noteworthy.

**10.** The Delaware Constitution, Article X, § 1 provides in part: "The General Assembly shall provide for the establishment and maintenance of a general and efficient system of the public schools . . . ."

In light of the clear intent to achieve a statewide educational policy, we find no impermissible enactment of a local or special law affecting the boundaries of a school district. If there be doubt as to this conclusion, and we find none, the presumption of constitutionality of a legislative enactment, insofar as permissible school district policy is concerned, would be entitled to special weight in this extraordinary situation of a General Assembly attempting to comply with federal court direction.

Question No. 2 is answered in the negative.

### CONCLUSION

The answer to Question No. 1 is in the negative. The answer to Question No. 2 is in the negative. The foregoing is the unanimous opinion of the Justices.

> Respectfully submitted,
>
> DANIEL L. HERRMANN
> Chief Justice
>
> WILLIAM DUFFY
>
> JOHN J. McNEILLY
>
> WILLIAM T. QUILLEN
>
> HENRY R. HORSEY
> Justices