**In re REQUEST OF the GOVERNOR FOR AN ADVISORY OPINION.**

No. 446, 1998.

Supreme Court of Delaware.

Submitted: Oct. 27, 1998.
Decided: Oct. 28, 1998.
Revised: Nov. 23, 1998.

Matthew P. Denn of Young, Conaway, Stargatt & Taylor, L.L.P., and Professor Lawrence A. Hamermesh (argued) of Widener University School of Law, Wilmington, appointed pro bono publico to advocate the affirmative position on the question presented.

Allen M. Terrell, Jr. (argued), Frederick L. Cottrell, III, and Claudia A. DelGross, of Richards, Layton & Finger, Wilmington, appointed pro bono publico to advocate the negative position on the question presented.

Before VEASEY, Chief Justice, WALSH, HOLLAND, HARTNETT and BERGER, Justices.

To: The Honorable Thomas R. Carper, Governor of the State of Delaware:

In your letter of October 16, 1998, you respectfully requested the opinions of the Justices regarding the following question "touching the proper construction" of the Constitution of Delaware:

Does an individual having been appointed a police officer of the Delaware State Police pursuant to 11 *Del.C.* § 8301 hold an "office under this State" for the purposes of Article II, § 14 of the Constitution of the State of Delaware? [1]

Your letter also advised us as follows:

The reason for this request is the candidacy of Trooper Douglas Salter for the Delaware House of Representatives, Seventeenth District. If the above question is answered in the affirmative, Trooper Salter's success in the coming election and acceptance of the Office of State Representative would act as a "resignation or renunciation" of his State Trooper appointment. *See Opinion of the Justices*, Del.Supr., 647 A.2d 1104, 1104 (1994) (*quoting State ex rel. Biggs v. Corley*, Del.Supr., 172 A. 415, 419–20 (1934)). An opinion of the Justices addressing whether it is incompatible for an active police officer with the Delaware

---

1. The issue presented here relates solely to the question of whether Trooper Salter, if elected to the General Assembly on November 3, 1998, will perforce vacate his position as a State Police officer when he is sworn into the office of State Representative. All parties agree that the constitutional provision that the "House shall be the judge of the elections, returns and qualifications of its own members" is not implicated. *Del. Const.* art. II, § 8.

State Police to serve simultaneously as an elected Representative in the Delaware General Assembly would give much needed guidance on this important constitutional issue which affects two branches of government.

 Delaware law permits, but does not require,[2] the Justices to give their opinions on questions propounded to them by the Governor or by resolution of both Houses of the General Assembly "touching the proper construction" of the Constitution of Delaware.[3] The statutes contemplate that the Justices may each provide an individual opinion or they may join in one opinion, as is the case here. Nevertheless, the opinions rendered pursuant to this statutory authority do not arise in a case or controversy, and are not an opinion of the Supreme Court. Thus, they are not binding in later litigation.[4] Though it is discretionary whether to answer questions propounded under this statutory framework, the Justices have decided to exercise their discretion in this instance because the question presented is important, raises an issue of first impression, and it is in the public interest to provide the answer in a timely manner.[5]

The Justices appointed counsel *pro bono publico* to brief and argue the respective positions in an expedited manner.[6] We commend counsel for their professionalism in providing excellent and timely service to assist the Justices in rendering this opinion. This professional service of counsel for both sides is in the highest tradition of the Delaware Bar. The Justices have, concurrently with the briefing schedule, conducted their own independent research, which has been combined and set forth in this single opinion.

The question presented is a difficult one that is not readily answerable from the statutes, the Constitution, the Constitutional Debates, Delaware judicial decisions or authorities from other jurisdictions. We have consulted as many of these authorities as time has allowed, and we have concluded that we must write on a clean slate on the precise facts before us, though we do so against the backdrop of these authorities and policy considerations implicating fundamental principles of separation of powers. Recognizing the possible practical implications of our opinion, we conclude unanimously that the question must be answered in the affirmative.

### Origin of Question

 This Court has recognized the general legal principle "that where the holder of an office accepts another incompatible office, the acceptance of the second office operates as a resignation or renunciation of the first office as fully and effectually as though the relinquishment of the first office had been an

---

**2.** All parties agree that the Justices should exercise their discretion to answer the question presented by the Governor. *See State ex rel. Biggs v. Corley*, Del.Supr., 172 A. 415, 419 (1934).

**3.** 10 *Del.C.* § 141(a):
(a) The Justices of the Supreme Court, whenever the Governor of this State or a majority of the members elected to each House may by resolution require it for public information, or to enable them to discharge their duties, may give them their opinions in writing touching the proper construction of any provision in the Constitution of this State, or of the United States, or the constitutionality of any law or legislation passed by the General Assembly, or the constitutionality of any proposed constitutional amendment which shall have been first agreed to by two-thirds of all members elected to each House.
*See also* 29 Del.C. § 2102 (to like effect).

**4.** *Opinion of the Justices*, Del.Supr., 413 A.2d 1245 (1980); 10 *Del.C.* § 141.

**5.** It is regrettable that the request for this opinion was not received by the Justices until the afternoon of Friday, October 16, 1998. The question presented by the request involves the consequences of an election contest for a seat in the Delaware House of Representatives. The election will take place as part of the General Election on Tuesday, November 3, 1998, a mere two weeks and four days from receipt of the request. Due to the desirability of appointing counsel to present briefs and oral argument, the matter could not reasonably be submitted to the Justices for decision in an orderly manner until Tuesday, October 27, 1998, one week before the election.

**6.** *See* 10 *Del.C.* § 141(b):
(b) The Justices of the Supreme Court may appoint 1 or more members of the Delaware Bar, duly qualified to practice before said Court, for the purpose of briefing or arguing the legal issues submitted by the Governor or General Assembly.

intentional and voluntary act." This principle of law applies where the incompatibility is declared by constitutional provisions such as Article II, § 14, and Article III, § 11, of the Delaware Constitution.[7] Moreover, this Court has held that "when the resignation has become effective by the acceptance of the incompatible office, a resignation of the second office does not revive or restore the right to hold the first office which has thus been abandoned or resigned."[8]

The reason for your request to the Justices regarding the *second clause* in Article II, § 14, of the Delaware Constitution is the candidacy of Trooper Douglas Salter for the Delaware House of Representatives, Seventeenth District. The question having been answered in the affirmative, Trooper Salter's success in the coming election and acceptance of the Office of State Representative by being sworn into such legislative office would act as his "resignation or renunciation" from the Delaware State Police.[9]

### Constitutional and Statutory Provisions

We begin with the applicable constitutional provision:

No Senator or Representative shall, during the time for which he shall have been elected, be appointed to any civil office under this State which shall have been created, or the emoluments of which shall have been increased during such time. *No member of Congress, nor any person holding any office under this State*, or the United States, except officers usually appointed by the courts of justice respectively, attorneys-at-law and officers of the militia, holding no disqualifying office, *shall during his continuance* in Congress or *in office be a Senator or Representative;* nor shall any person while concerned in any army or navy contract be a Senator or Representative.[10]

The crucial question is: What did the framers intend when they used the phrase, "office under this State"?

### *Facts*

The relevant facts underlying the question presented are detailed in your letter of October 16, 1998.

The executive branch of government, as established by the 1897 Delaware Constitution, is currently operated by a cabinet format that includes the Department of Public Safety. The Secretary of Public Safety is appointed by the Governor. The Delaware State Police is an agency within that division of the executive branch.

Pursuant to 11 *Del.C.* § 8301, the Department of Public Safety has the authority to appoint police officers. Section 8302(a) further defines the powers and duties of these officers:

State police shall have police powers similar to those of sheriffs, constables and other police officers, and shall be conservators of the peace throughout the State, and they shall suppress all acts of violence, and enforce all laws relating to the safety of persons and property. The State Police shall be the primary law-enforcement agency within the State....

The Department of Public Safety determines the rank of State Police officers based on their specific assignments, consistent with the duties and authorities described above.[11]

Upon commission, all officers of the Delaware State Police are required to take an oath of office pledging faithfully to discharge all the duties of an officer in the Delaware State Police and obey the orders of superior officers:

I do solemnly swear that as long as I am employed by the Delaware State Police I will bear true faith and allegiance to the United States of America and the State of Delaware, and that I will serve them hon-

---

7. *Corley,* 172 A. at 419–20. *See also Opinion of the Justices,* Del.Supr., 647 A.2d 1104 (1994).

8. *Id.*

9. *See Opinion of the Justices,* 647 A.2d 1104 (quoting *Corley,* 172 A. at 419–20).

10. *Del. Const.* art. II, § 14 (emphasis supplied).

11. 11 *Del.C.* § 8301.

estly and faithfully against all its enemies whomsoever; that I will support the Constitution of the United States of America and the Constitution of the State of Delaware and faithfully discharge all the duties of an officer in the Delaware State Police according to the best of my ability; that I will obey the orders of the officers appointed over me.

These duties include the execution, administration and enforcement of the laws of this State. To this end, officers have the power and duty to investigate violations of laws within the State and also have the statutory authority and duty to arrest, both with a warrant, and in certain circumstances, without a warrant.[12] To effectuate such arrests, officers are given the authority to use "force upon or toward the person ... when the [officer] is making or assisting in making an arrest and believes that such force is immediately necessary to effect the arrest."[13] Even deadly force may be used by officers under certain circumstances.[14]

Officers of the Delaware State Police are paid salaries, receive benefits and are reimbursed for expenses in accordance with state policy. Sergeant Salter was appointed an officer of the Delaware state Police on August 29, 1986 and currently serves in the Planning Section of the Delaware State Police.

12. *See* 11 *Del.C.* § 8302; 11 *Del.C.* § 1904.

13. 11 *Del.C.* § 467(a).

14. 11 *Del.C.* § 467(c).

15. *Del. Const.* art. XV, § 1.

16. *Opinion of the Justices,* Del.Supr., 672 A.2d 4, 8 (1995).

17. *Del. Const.* art. XV, § 5:

All public officers shall hold their respective offices until their successors shall be duly qualified, except in cases herein otherwise provided.

18. *Opinion of the Justices,* 672 A.2d at 7.

19. *Id.* The 1994 Opinion of the Justices made it clear that the terms "public officer" and "office under the State," as used for different purposes, require separate analyses for each purpose. In that opinion, the Justices expressly did not ex-

### Prior Delaware Precedents

Of course, there was no such entity as the State Police in 1897. But there were sheriffs and other conservators of the peace.[15] Did the framers intend that persons holding these positions would be deemed to "hold [an] office under this State"? Does it follow that all modern-day State Troopers, being conservators of the peace, hold "office under the State"?

In 1995 the Justices concluded[16] that each member of a board or commission appointed pursuant to Title 23 or 24 of the Delaware Code possesses the essential characteristics of a public officer as that term is used in Article XV, § 5, of the Delaware Constitution, and therefore they could hold over in office.[17] It makes no difference whether a public office is created by a statute or the Constitution itself.[18] There is no single definition of "public officer," but there are certain characteristics, including: (1) the exercise of some portion of the State's sovereign power, (2) tenure in office, (3) fees and emoluments, and (4) oaths of office.[19] We should add to this list a fifth characteristic: The powers and duties of position are conferred and defined by law.[20] Importantly, however, Delaware jurisprudence does not rigidly require that each of these characteristics must be met in order for one to qualify as a public officer.[21] Under our jurispru-

press a view on *Del. Const.* art. IV, § 14. *Id.* 672 A.2d at 7 n. 6.

20. *Martin v. Trivitts,* Del.Supr., 103 A.2d 779 (1954).

21. *Opinion of the Justices,* 672 A.2d at 8. Some other states have more exacting methods of resolving these questions. The Iowa Supreme Court, for example, has stated that:

five essential elements are required by most courts to make a public employment a public office. They are: (1) The position must be created by the constitution or legislature or through authority conferred by the legislature. (2) A portion of the sovereign power of government must be delegated to that position. (3) The duties and powers must be defined, directly or impliedly, by the legislature or through legislative authority. (4) The duties must be performed independently and without control of a superior power other than the law. (5) The position must have some permanency and

dence, these characteristics are merely indicia of office used as guidelines for judicial analysis, not immutable criteria conjunctively stated.[22] It has been argued in this matter by counsel advocating the negative to the question presented that there must be legislation or a constitutional provision creating the specific "office under the State." We do not believe that is a necessary criterion.

One of these characteristics stands out above the others: the exercise of some portion of the State sovereign power.[23] In our view, that exercise must have some element of independence as well. That is, the person must have an independent governmental duty that he or she is required to undertake by virtue of his position,[24] not solely as an instrumentality directed by another.[25]

### Other Jurisdictions

Courts applying Indiana and Kansas law both have found that police officers meet the definition of a public officer. The Seventh Circuit Court of Appeals accepted the Indiana Supreme Court's reasoning that "since a police officer had the duties to preserve the peace, protect and arrest offenders, suppress riots, protect the rights of persons and property, inspect all places of business

under license and enforce and prevent the violation of all ordinances and laws in force, a police officer was a public officer."[26] The Supreme Court of Kansas found that

the Legislature and the courts have raised [the policeman] out of the class of a mere subordinate or employe [sic] like a field man of a local department of health or a cellhouse man at the penitentiary. A policeman is a conservator of the peace and exercises many of the functions of sovereignty, and important duties are imposed upon him by the legislature.[27]

Counsel urging us to answer the question in the negative contend that one who holds "office under the State" must have "independent authority under law, either alone or with others of equal authority, to determine public policy or to make a final decision not subject to the supervisory approval or disapproval of another."[28] Clearly, this would apply to those higher than Sergeant Salter in the chain of command in the State Department of Public Safety. There would seem to be little dispute that the cabinet level Secretary of the Department or the Superintendent of Police are in that category. But, as one goes down the chain of command to the rank of sergeant or below, does it follow that the officer has no authority to act independent of his or her superiors or to determine

continuity, and not be only temporary and occasional.
*State v. Taylor,* Iowa Supr., 260 Iowa 634, 144 N.W.2d 289, 292 (1966) (citation omitted).

**22.** *See Opinion of the Justices,* 672 A.2d at 8.

**23.** *Corley,* 172 A. at 419 (a public office involves "the authority and duty to exercise some part of the sovereign power of the State either in making, administering or executing the law of the State").

**24.** *See Barker v. State,* Ohio Supr., 69 Ohio St. 68, 68 N.E. 575, 576–77 (1903), *quoting State ex. rel. v. Halliday,* 61 Ohio St. 171, 55 N.E. 175 (1899) ("The most essential characteristic [of an office] is . . . 'that the incumbent, in his independent capacity, is clothed with some part of the sovereignty of the state, to be exercised in the interest of the public, and required by law,' . . . .").

**25.** *Compare State ex rel. Green v. Glenn,* Del.Super., 4 A.2d 366 (1939), where the Court found that the Secretary to the Department of Elections for the City of Wilmington was a public employee

and not a public officer because his duties were defined by the Board of Elections and not by the statute creating the Board of Elections. He did not exercise any portion of the state's sovereign power, even though the Board of Elections did.

**26.** *Blake v. Katter,* 7th Cir., 693 F.2d 677, 680 (1982); *see also Acevedo v. City of North Pole,* Alaska Supr., 672 P.2d 130, 134 (1983); *Macy v. Heverin,* Md.Ct.Spec.App., 44 Md.App. 358, 408 A.2d 1067, 1069 (1979); *Ferraro v. City .School Dist. of Schenectady,* N.Y.Sup.Ct., 69 Misc.2d 800, 331 N.Y.S.2d 490, 493–94 (1972).

**27.** *Haney v. Cofran,* 94 Kan. 332, 146 P. 1027 at 1028, *modified by* 95 Kan. 335, 148 P. 640 (1915).

**28.** *McCutcheon v. City of St. Paul,* Minn.Supr., 298 Minn. 443, 216 N.W.2d 137, 138 (1974) (holding that police officers of the City of St. Paul—not the State of Minnesota—were not required to resign their police positions upon election to the State legislature under a state constitutional provision similar to *Del. Const.* art. II, § 14).

public policy? To be sure, the independence and policy-determining role of a State Police officer is a matter of degree, becoming more significant as one goes up the chain of command. But as traditional conservators of the peace, and pursuant to the statutory authority of 11 *Del.C.* § 8302(a), an individual sworn State Police officer does possess the potential to exercise a degree of independent or policy-determining authority. This is true even though the officer is subject to (and even takes an oath to) obey the orders of his or her superior. One could conceive of a circumstance—unlikely as it may be—where a State Police officer, a member of the executive branch, could sit as a member of the legislative branch and independently carry out his or her own law enforcement agenda or that of the Governor, and such an agenda would not necessarily be that of the constituents of the officer's representative district.

### *Delaware State Police*

 The Delaware General Assembly has identified specific duties of State Troopers. In addition to their primary duty to "compel the enforcement of all laws relating to the weight, speed and operation of vehicles on the public highways ...," [29] State Troopers also "shall suppress all acts of violence, and enforce all laws relating to the safety of persons and property." [30] Although a State Trooper must carry out assignments provided by superiors, and may be assigned to duties that appear purely ministerial, the duties conferred by statute apply to all State Troopers. The duty, even more so than the right, to enforce the laws of the State entails a delegation to State Troopers of a function of sovereignty.

The remaining indicia of office, while helpful, do not add a great deal to this analysis. They are much more helpful in discerning who is not a public officer than who is a public officer. An individual is much less likely to be a public officer if that individual does not take an oath, but the converse is not necessarily true. [31] In this case, the oath administered to State Troopers is very similar to that mandated by the Delaware Constitution for public officers, but this alone does not establish that State Troopers are public officers. [32] The same is true with respect to the indicium relating to the term of office. Although an individual serving a defined term of office is more likely to be a public officer, this should not be read to indicate that a person whose service to the State is continuous and indefinite in time cannot be a public officer. Finally, the indicium relating to fees and emoluments is helpful primarily in situations where the alleged public officer is serving in a voluntary capacity. A volunteer is less likely to be a public officer of the State. All State employees receive some pecuniary benefit from their service. This alone cannot determine whether an individual is a public officer.

Therefore, the indicium of the exercise of State sovereignty should be the principal fo-

29. 11 *Del.C.* § 8301.

30. 11 *Del.C.* § 8302.

31. *See* 29 *Del.C.* § 5101:
 Every person elected or appointed to any public office of trust or profit in this State, before entering upon the duties of such office, shall take and subscribe the oaths or affirmations set forth in article XIV of the Constitution.
 *Compare* 29 *Del.C.* § 5102:
 Every officer and *employee* of the State ... shall take an oath to support and defend the Constitution of the United States and the Constitution of the State before commencing duties as such officer or *employee*. (Emphasis supplied).

32. The oath provided in *Del. Const.* art. XIV, § 1:
 I do solemnly swear (or affirm) that I will support the Constitution of the United States, and the Constitution of the State of Delaware, and that I will faithfully discharge the duties of the office of .................. according to the best of my ability....
 The oath provided for State Troopers:
 I do solemnly swear that as long as I am employed by the Delaware State Police I will bear true faith and allegiance to the United States of America and the State of Delaware, and that I will serve them honestly and faithfully against its enemies whomsoever; that I will support the Constitution of the United States of America and the Constitution of the State of Delaware and faithfully discharge all the duties of an officer in the Delaware State Police according to the best of my ability; that I will obey the orders of the officers appointed over me.

cus. That, in turn, implicates principles of separation of powers.

### Separation of Powers Delaware Constitutional History

In answering your question, the Justices concluded that a review of the case law from Delaware and other jurisdictions was not sufficient, standing alone. It is essential to analyze the history of the Constitutions of the State of Delaware through the prism of fundamental principles of separation of powers.[33]

As the collective estrangement between the American colonies and the British monarch mounted, the need for stabilizing each colony's internal affairs intensified. In May of 1776, all hope of reconciliation was abandoned. The colonies were advised to form new governments by the Second Continental Congress.[34]

The Continental Congress considered, but eventually declined to recommend, any model format of governance for the states to adopt.[35] With the drafting and adoption of state constitutions in America, came a paradigm shift in the character of written frameworks for government.[36] Although the specific provisions varied, the legal result reflected in each state constitution was the same: to define sovereignty with precision and to restrain its exercise within marked boundaries,[37] according to rules of law.[38]

No principle of American constitutionalism has attracted more attention than separation of powers. It has come to define the essential character of the American political system. The notion of distinct powers of government can be traced to antiquity, but its more immediate sources for American colonists in 1776 were philosophers such as Charles Montesquieu,[39] Jean Jacques Rousseau,[40] and John Locke;[41] and by English common law scholars like Edward Coke, Henry deBracton, and William Blackstone.[42] Montesquieu had advised against the concentration of governmental power.[43]

When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty.... Again, there is no liberty, if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would then be the legislator. Were it joined to the executive power, the judge might behave with violence and oppression. There would be an end to everything, were the same man, or the same body, whether of the nobles or of the people, to exercise those three powers, that of enacting laws,

**33.** *See* Randy J. Holland, *State Constitutions: Purpose and Function*, 69 TEMP.L.REV. 989 (1996), and RANDY J. HOLLAND, HARVEY B. RUBENSTEIN, ET. AL, THE DELAWARE CONSTITUTION OF 1897: THE FIRST ONE HUNDRED YEARS (1997).

**34.** GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC 1776–1787, 131–32 (1969). The resolution was adopted May 10, 1776. A preamble was added on May 15, 1776. WILLI PAUL ADAMS, THE FIRST AMERICAN CONSTITUTIONS: REPUBLICAN IDEOLOGY AND THE MAKING OF THE STATE CONSTITUTIONS IN THE REVOLUTIONARY ERA 61 (1980). John Adams served with Edward Rutledge of South Carolina and Richard Henry Lee of Virginia on the committee that drafted the resolution. *See* Wood, *supra.*

**35.** Robert F. Williams, *State Constitutional Law Processes*, 24 WM. & MARY L.REV. 169, 173 (1983). ADAMS, *supra* n. 34, at 56.

**36.** George Athan Billias, *American Constitutionalism and Europe, 1776–1848, in* AMERICAN CONSTITUTIONALISM ABROAD 13–14, 19–23 (1990).

**37.** *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 168, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (Souter, J., dissenting) (quoting *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 398–99, 1 L.Ed. 648 (1798) (Iredell, J., dissenting)).

**38.** *See* Holland, *State Constitutions: Purpose and Function, supra* note 33, and HOLLAND, RUBENSTEIN, ET. AL., THE DELAWARE CONSTITUTION OF 1897: THE FIRST ONE HUNDRED YEARS, *supra* note 33.

**39.** *See* BARON DE MONTESQUIEU, THE SPIRIT OF THE LAWS (Thomas Nugent trans., 1949).

**40.** *See* Paul M. Spurlin, *Rousseau in America* 1, FRENCH-AMERICAN REVIEW 8–16 (1948).

**41.** JOHN LOCKE, THE SECOND TREATISE OF GOVERNMENT §§ 221, 243 (T. Peardon ed., 1952).

**42.** DANIEL A. FARBER & SUZANNA SHERRY, A HISTORY OF THE AMERICAN CONSTITUTION 6 (1990).

**43.** MONTESQUIEU, *supra* n. 39.

that of executive the public resolutions, and of trying the causes of individuals. Blackstone had also described the division of authority as the strength of the English Constitution:[44]

> whenever the [legislative and executive] powers are united together, there can be no public liberty. The magistrate may enact tyrannical laws, and execute them in a tyrannical manner, since he is possessed in quality of dispenser of justice, with all the power, which he, as legislator, things proper to give himself. But where the legislative and executive authority are in distinct hands, the former will take care not to entrust the latter with so large a power, as may tend to the subversion of its own independence, and therewith of the liberty of the subject.

Advocates of a state constitutional separation of powers carefully addressed the problems of plural office holding.[45] They feared, in particular, the dangerous accumulation of both executive and legislative powers in the same hands.[46] The authors of the first state constitutions, including the Delaware Constitution of 1776, did not seek merely to prohibit a man from holding more than one office; they prevented officials in one branch from also becoming officials in another.[47] They hoped thereby to avoid concentrations of power in any one branch of government or any group of men.[48]

### The Delaware Constitution of 1776

The 1776 Delaware Constitution divided our State government into the three great departments: legislative, executive and judicial.[49] To preserve the freedom and independence of each, and to take care that those chosen to represent the people in the legislature should be representatives and nothing more, the 1776 Delaware Constitution included a comprehensive article prohibiting certain officeholders from the legislature.[50] It enumerated Justices of the Supreme Court and of Common Pleas, the Secretary, Trustees of the Loan Office, Court Clerks, and "all Persons concerned in any Army or Navy Contracts."[51] Any legislator who accepted any of those positions automatically vacated his seat.[52] The 1776 Delaware Constitution also provided for a four-member privy council, two chosen by the legislative council and two by the House of Assembly. If a member of the legislature were elected to the privy council, he would lose his seat.[53] Thus, at its inception in 1776, the constitutional history of Delaware reflects a desire to preserve the independence and undivided loyalty of its state officials by prohibiting the simultaneous holding of either certain Delaware state offices or the public office of another "sovereignty."[54]

### The Delaware Constitution of 1792

On December 7, 1787, Delaware became the first state to ratify the United States Constitution. Article I, § 6, of the United States Constitution stated:

> No Senator or Representative shall, during the Time for Which he was elected, be appointed to any civil Office under the Authority of the United States, which shall

---

**44.** 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 150–51 (a Facsimile of the First Edition of 1765–69 by University of Chicago Press 1979).

**45.** MARC W. KRUMAN, BETWEEN AUTHORITY AND LIBERTY: STATE CONSTITUTION MAKING IN REVOLUTIONARY AMERICA (University of North Carolina Press 1996).

**46.** M.J.C. VILE, CONSTITUTIONALISM AND THE SEPARATION OF POWERS (Oxford 1967).

**47.** *Id.*

**48.** W.B. Gwyn, *The Meaning of the Separation of Powers*, XI TULANE STUDIES IN POLITICAL SCIENCE (New Orleans 1965).

**49.** *Corley*, 172 A. at 419.

**50.** *Id.*

**51.** *Del. Const.* of 1776, art. 18.

**52.** *Id.*

**53.** *Del. Const.* of 1776, art. 8.

**54.** BUSHMAN, HANCOCK, & HOMSEY, PROCEEDING OF THE CONSTITUTIONAL CONVENTION OF 1776, pp. 22–26, 202–231 (1986). On the identification of separation of powers with plural office-holding *see*, in particular, ELLEN E. BRENNAN, PLURAL OFFICE HOLDING IN MASSACHUSETTS, 5, 9, 61–62, 113–18, 154, 159 (Chapel Hill 1945).

have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.

The United States Constitution, like the Second Continental Congress, did not prescribe a format for either exercising or circumscribing state sovereignty. The United States Constitution does not require a state to separate the exercise of its own sovereign power horizontally: among an executive, a legislature, and a judiciary.[55] State constitutions also are not required to divide sovereign power vertically: between state government and local political subdivisions.[56]

From 1776 until 1787, the doctrine of separation of powers had been expanded and exalted by the Americans to the foremost position in their constitutionalism. In 1792, James Madison described the separation of powers doctrines as "a first principle of free government,"[57] premised on the belief, in John Dickinson's words, that "government must never be lodged in a single body."[58] According to Dickinson, government should be committed to three or four departments "*distinct in office,* and yet connected in operation."[59]

When Delaware convened a convention to revise its state constitution in 1791, John Dickinson was elected to preside.[60] A provision very similar to Article I, § 6, of the United States Constitution was considered in draft form.[61] The Committee eventually approved a draft that stated:[62]

No senator or representative shall, during the time for which he shall have been elected, be appointed to any civil office under this state, which shall have been created, or the emoluments of which shall have been increased during such time. No person concerned in any army or navy contract, no member of Congress, nor any person holding any office under this state, or the United States, except Attorneys at law, and officers in the militia, shall during his continuance in congress or in office, be a Senator or Representative.[63]

When the full convention considered the committee's draft, more questions arose. First, the convention decided to postpone consideration of this portion of the state constitution until "the powers of the state officers, therein proposed to be excluded from the legislature, be defined."[64] At the suggestion of John Dickinson, three additional exceptions to the overall prohibition on dual office-holding were added, for officers appointed by the judiciary, militia members who did not hold disqualifying office, and the attorney general, and the clause was then approved by the convention.[65] The clause, as it was finally ratified as Article II, § 12, of the Delaware Constitution of 1792, read:

No Senator nor Representative shall, during the time for which he shall have been elected, be appointed to any civil office under this state, which shall have been

**55.** *See Whalen v. United States,* 445 U.S. 684, 689 n. 4, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); *Springer v. Philippine Islands,* 277 U.S. 189, 201, 48 S.Ct. 480, 72 L.Ed. 845 (1928); Michael E. Libonati, *Intergovernmental Relations in State Constitutional Law: A Historical Overview,* 496 Annals Am. Acad. Pol. & Soc. Sci. 107, 108–16 (1988).

**56.** James E. Herget, *The Missing Power of Local Governments: A Divergence Between Text and Practice in Our Early State Constitution,* 62 Va. L.Rev. 999, 1001 (1976).

**57.** [James Madison], Philadelphia *National Gazette,* Feb. 6, 1792, The Writings of James Madison (Gaillard Hunt, ed. N.Y.1900–10), VI, 91.

**58.** The Political Writings of John Dickinson (1801). Dickinson, *Letters of Fabius,* Ford, ed., Pamphlets, 182–83 (Ford, ed.) (emphasis supplied).

**59.** *Id.*

**60.** *Claudio v. State,* Del.Supr., 585 A.2d 1278, 1295 (1991).

**61.** Bushman, Hancock & Homsey, Proceedings of the House of Assembly of the Delaware State 1781–1792 and of the Constitution Convention of 1792 (1988), p. 793 (reflecting debates of December 22, 1791) (hereinafter "Proceedings of 1792 Constitutional Convention").

**62.** *Id.* at 798.

**63.** *Id.* at 866.

**64.** *Id.*

**65.** *Id.* at 894–95.

created, or the emoluments of which shall have been increased during such time. No person concerned in any army or navy contract, no member of Congress, nor any person holding any office under this state, or the United States, except the attorney-general, officers usually appointed by the courts of justice respectively, attorneys at law, and officers in the militia, holding no disqualifying office, shall, during his continuance in Congress or in office, be a Senator or Representative.[66]

This section is the predecessor to the state constitutional provision which is the focus of the question now before the Justices. Article II, § 12 of the 1792 Constitution was included, with minor punctuation changes, in Delaware's Constitution of 1831. And the provision was duplicated again in the Delaware Constitution of 1897 with a minor change in language to clarify the status of members of the army and navy.

### Separation of Powers

The history of the Delaware Constitutional prohibition of dual office holding in separate branches of persons holding an office under the State is interesting. The 1776 Constitution forbade judges and certain specified officeholders from serving in the General Assembly.[67] The United States Constitution as ratified in 1787 contained a dual office-holding prohibition which is quite similar to Dela-

ware's current provision at issue here.[68] The essence of the current Delaware provision was first incorporated in the Delaware Constitution in the 1792 Constitution and was continued with only minor changes in the 1831 and 1897 Constitutions.[69]

The leading Delaware case, previously discussed, is *Corley*.[70] That decision rested essentially on the characteristics of public office used in modern jurisprudence, including principally "the authority and duty to exercise some part of the sovereign power of the state either in making, administering or executing the laws of the state."[71] That indicium of public office is the primary one separating such officers from mere employees. The *Corley* court relied in part on the U.S. Supreme Court decision of *United States v. Hartwell*[72] that had applied the United States Constitutional provision (art I, § 6) that closely resembles *Del. Const.* art. II, § 14. In *Hartwell*, the public officer was found to have the characteristics of "tenure, duration, emolument and duties"—and those duties were found to be "continuing and permanent, not occasional or temporary."[73] We assume, for purposes of this opinion, that public school teachers and other civil employees of the State who serve in the General Assembly and who do not independently exercise the sovereign power of the State on a continuing and permanent basis do not hold an "office under this State." While that is-

---

66. *Del. Const.* of 1792 art. II, § 12.

67. *Del. Const. of 1776* art. 18, provides:

 The Justices of the Supreme Court and Courts of Common Pleas, the Members of the Privy Council, the Secretary, the Trustees of the Loan Office and Clerks of the Courts of Common Pleas, during their continuance in office, and all persons concerned in any army or navy contracts, shall be ineligible to either House of Assembly; and any Member of either House accepting of any other of the offices herein before mentioned (excepting the office of a Justice of the Peace) shall have his seat thereby vacated, and a new election shall be ordered.

68. *U.S. Const.* art. I, § 6, provides, in pertinent part:

 No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created,

 or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.

69. *Del. Const. of 1792* art. II, § 12, and art. III, § 5; *Del . Const. of 1831* art. III, § 5; *Del. Const. of 1897* art. II, § 14.

70. 172 A. 415. *See also Dorai v. City of Dover Bd. of Elections*, Del.Super., Civ.A. No. 93C–12–31, 1994 WL 146012, Herlihy, J., (Mar. 25, 1994) (Mem. Op.) *aff'd*, Del.Supr., 642 A.2d 836 (1994).

71. *Id.* at 419.

72. 6 Wall. 385, 73 U.S. 385, 18 L.Ed. 830 (1867).

73. *Id. See also Reservists Committee to Stop the War v. Laird*, 323 F.Supp. 833 (1971), *aff'd* 495 F.2d 1075 (D.C.Cir.1972), *rev'd on other grounds sub nom.*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

sue is not before us and we express no opinion thereon, it seems clear that the position of such an employee is significantly different from that of a State Police officer, who does have the authority to exercise such power.[74]

### Conclusion

■ Separation of powers "exists in this State as a fundamental in our Constitutional law."[75] As a result of the separation of powers doctrine, "one [branch] may not encroach upon the field of either of the others."[76] As the Delaware State Police is part of the executive branch of State government,[77] an individual in the State legislature may not also be a State Trooper for this would act as an "encroachment" upon another branch of government.

Other jurisdictions have reached a similar finding with respect to the specific issue of police officers and legislators. The Georgia Supreme Court, using a separation of powers analysis, found that dual officeholding was improper because "[i]f permitted to serve in their dual capacities as alderman (legislative) and policemen (executive), the appellants could not only vote to set their own salaries, but also enforce ordinances which they had participated in enacting."[78] Similarly, the Alabama Supreme Court, in a case involving a sheriff seeking office in the Alabama legislature, held that "[t]he constitutional prohibition is not directed against the election to office ... of a person holding office in another department; but it is against the holding of two offices, whereby the same individual would exercise power and discharge duty

pertaining to different branches of government."[79]

State Police Sergeant Salter exercises some portion of the power of the executive branch of the Delaware government, including the enforcement of legislative acts. As a member of the General Assembly, he would exercise the power of the legislative branch, including the ability to affect his duties and pay as a State Trooper. Because Sergeant Salter is a public officer of the executive branch, there is a separation of powers problem, and allowing him to maintain both public offices would work an impermissible commingling of two separate branches of State government.

The prohibition in Article II, § 14, against a person "holding an office under this State" from simultaneously serving in the Delaware General Assembly, must be construed in the historical context of Delaware's two-fold commitment to a separation of powers in its Constitutions of 1776, 1792, 1831 and 1897. In accordance with John Dickinson's formulation, Delaware has always separated its powers of government by keeping them both "distinct in department" and "distinct in office."[80] The Delaware Constitution of 1897 provides for exclusive action of each branch within its own sphere. Laws are to be enacted by the legislative branch (Article II), enforced by the executive branch (Article III), and construed by the judicial branch (Article IV).[81]

■ The prohibition against dual officeholding in the second clause of Article II, § 14, is intended to maintain that tripartite balance of power among the branches of government by precluding more than one of

74. *Opinion of the Justices,* Del.Supr., 245 A.2d 172 (1968).

75. *Opinion of the Justices,* Del.Supr., 380 A.2d 109, 113 (1977).

76. *Trustees of New Castle Common v. Gordy,* Del. Supr., 93 A.2d 509 (1952).

77. In *Delaware State Troopers' Lodge,* 9 Del. J.Corp.L. at 431 (1984), the Court of Chancery referred to "the Governor as the head of the Executive Branch of State government ... and the Superintendent of the Delaware State Police as [a] necessarily involved member[ ] of the executive branch...."

78. *Fowler v. Mitcham,* 249 Ga. 400, 291 S.E.2d 515, 518 (1982).

79. *Scott v. Strobach,* 49 Ala. 477 (1873).

80. *See* THE POLITICAL WRITINGS OF JOHN DICKINSON, *supra* n. 58.

81. *See In re Appeal of Infotechnology, Inc.,* Del. Supr., 582 A.2d 215, 216–217 (1990); *In re Nenno,* Del.Supr., 472 A.2d 815, 819 (1983); *see also* Joseph T. Walsh, *Judicial Independence: A Delaware Perspective,* —— DEL. L. REV. (forthcoming).

those separate sovereign functions to be performed by the same person.[82]

Each of the Justices independently has concluded that Sergeant Salter's position with the Delaware State Police is an "office under this State," as that term is used in the second clause of Article II, § 14, and not mere employment. The record reflects that his position with the Delaware State Police, in varying degrees, satisfies all of the non-exclusive criteria that define an "office." [83] Most important, Sergeant Salter's duties with the Delaware State Police require him to perform the sovereign function assigned to the executive branch of enforcing the laws of the State of Delaware. If he were simultaneously to occupy a seat in the Delaware House of Representatives, he would be called upon to perform the sovereign function assigned to the legislative branch of enacting the laws of the State of Delaware. The combination of those two sovereign functions in one person is antithetical to separation of powers between the three branches of government in Article II, III, and IV of the Delaware Constitution of 1897. Our analysis reflects that is exactly why Article II, § 14, of the Delaware Constitution has always prohibited such dual office holding.

The Justices are of the unanimous view that the question you presented to each of us must be answered in the affirmative.

---

**82.** The majority of state constitutions include provisions that specifically forbid legislators from occupying certain other positions during their legislative terms. Those state constitutions vary extensively in their designation of those exact prohibitions. *See* John Devlin, *Toward a State Constitutional Analysis of Allocation of Powers:*

*Legislators and Legislative Appointees Performing Administrative Functions*, 66 TEMP.L.REV. 1205, 1236–43 (1993).

**83.** *See Opinion of the Justices*, 672 A.2d at 7.