**In re REQUEST OF the GOVERNOR FOR an ADVISORY OPINION.**

**No. 150, 2009.**

Supreme Court of Delaware.

Submitted: March 19, 2009.
Decided: May 27, 2009.
As Corrected: May 29, 2009.

---

10. *Id.*

11. 576 A.2d 1322 (Del.1990).

12. *Id.* at 1323.

13. *Id.* at 1329 (citations omitted).

14. D.R.E. 201.

Lawrence C. Ashby (argued), Richard D. Heins, Catherine A. Gaul and Toni–Ann Platia, Ashby & Geddes, Wilmington, DE, for the Negative Position.

Andre G. Bouchard (argued), David J. Margules, Joel Friedlander, James J. Merkins, Jr., and Sean M. Brennecke, Bouchard Margules & Friedlander, P.A., Wilmington, DE, for the Affirmative Response.

Kenneth J. Nachbar (argued), Michael Houghton, Geoffrey A. Sawyer, III, and Brenda R. Mayrack, Morris Nichols Arsht & Tunnell, LLP, Wilmington, DE, for Amicus Curiae The National Football League.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices.

Pursuant to 10 *Del. C.* § 141 and 29 *Del. C.* § 2102, you asked the Justices for their opinions regarding the proper construction of Article II, Section 17 of the Delaware Constitution in relation to your initiative to reinstitute a sports lottery. To assist you and the General Assembly in fulfilling your respective constitutional duties to enact a balanced budget before the end of the fiscal year, we agreed to expedite our response. For the reasons that follow, we answer your question in part, but conclude that certain aspects of your question cannot be answered on the current record.

## FACTS

In a March 19, 2009 letter to this Court, providing a basic outline of the proposed sports lottery, you described the sports lottery as follows:

(a) The sports lottery would be under control of the state. Specifically, the state would have the power and the duty to operate and administer the sports lottery and promulgate rules and regulations for that purpose. The state would control, among other things, the type and number of games to be conducted, the payouts from the sports lottery games, price or prices of tickets for any game, the licensing of agents for sports lotteries, the regulation of licensed agents, vendors and other persons involved in the sports lottery, advertising standards, and security arrangements. In general, the applicable elements of control exercised by the State over the video lottery pursuant to 29 *Del. C.* § 4801, *et seq.* would be extended to the sports lottery.

(b) The sports lottery would be operated for the purpose of raising funds. Specifically, my proposal would mandate that proceeds from the sports lottery, less amounts returned to winning players, be returned to the state at a rate of no less than 50% of the total win. All amounts returned to the state for its use would be used for administration of the Delaware Lottery and/or contributed to the General Fund.

(c) The games offered by the sports lottery would be, at all times, "lotteries" within the meaning of that term in Article II, Section 17. The games offered as part of a sports lottery would be structured so that, in every case, the outcome is determined by chance. To achieve that, games offered through the sports lottery would involve a "line" or a similar mechanism, the purpose of which

would be to make the outcome of wagering on the winner of the contest a 50/50 proposition and to ensure that approximately equal amounts of wagers accrue on each side of the game. For example, a "line" might be the predicted point spread between two teams. Or, for "total" games, the "line" would be a number representing the total score for that game, and the player would select either the "over" (more points than the line would be scored) or the "under" (less points than the line would be scored). Using the "line" template to ensure that the game is decided by chance, the State Lottery is contemplating one or more of the following games.

(i) Single Game Lottery: Players must select the winning team in any given contest with a line.

(ii) Total Lottery: Players must select whether the total scoring in a game will be over or under the total line.

(iii) Parlay Lottery: Players must select the winning outcome on multiple elements, such as the winner of two or more games, the winner of two or more over-under bets.

No game would offer a pay-out based on pool or pari-mutuel wagering.

In your initial letter, you requested the Justices' opinions regarding the following question:

Is the proposed Delaware sports lottery, as described above, in whole or in part, a permissible lottery under State control under Article II, Section 17 of the Delaware Constitution of 1897?

In a March 31, 2009 supplemental letter, you forwarded a copy of House Bill 100, which was the then-pending enabling statute for the proposed sports lottery.

We appointed Andre G. Bouchard of Bouchard, Margules & Friedlander P.A., to present an affirmative response and Lawrence C. Ashby of Ashby & Geddes, to present a negative response to your question.[1] We also asked counsel to consider the following subsidiary issues that we concluded might affect our ability to answer your question:

(1) May the Justices, in their discretion, opine on the constitutionality of a proposed statute that has been introduced by the General Assembly, but not yet passed?

(2) If not, please reformulate the Governor's question and specify any factual limitations that would allow the Justices to answer his request as fully as possible. Please analyze the issue as reformulated.

(3) If the Justices may opine on the Governor's request as submitted, please address whether it is constitutionally permissible to delegate to the Director of the State Lottery the authority to "provide for the features and attributes" of any sports lottery games. In addition, please address whether there are any essential characteristics that any such games must possess to qualify as a permissible lottery under the constitution.

On April 6, 2009, Members of the General Assembly offered House Substitute No. 1 for House Bill 100. Although we expressed concern, in an April 30, 2009 letter, that the circumstances underlying your initial request for our opinions may

1. We greatly appreciate the *pro bono* service of the teams of attorneys who assisted in presenting the affirmative and negative responses to your question. We thank David J. Margules, Joel Friedlander, James J. Merkins, Jr., and Sean M. Brennecke, for assisting with the affirmative response. Similarly, we recognize the efforts of Richard D. Heins, Catherine A. Gaul, and Toni–Ann Platia in presenting the negative response.

have significantly changed and were in flux (possibly mooting your initial request), we agreed to maintain the original briefing schedule.

The General Assembly then passed House Substitute No. 1 to House Bill 100, as amended, by the requisite majority, and you signed that legislation on May 14, 2009. That same day, you renewed your request for our opinions, informing us that you had instructed the Department of Finance and the Delaware Lottery Office to begin implementing a sports lottery. You also reiterated the need for a timely response to enable you to work with the General Assembly to craft and pass a balanced budget for fiscal year 2010 before June 30, 2009.

On May 21, 2009, we heard oral argument. In addition to hearing counsel for both sides of the issues, we allowed the National Football League (we had already allowed the NFL to submit a brief as *amicus curiae*) to participate in the argument.

### DISCUSSION

 When presented with a request for an Opinion of the Justices, the individual Justices *may* give the Governor "their opinions in writing touching the proper construction of any provision in the Consti-

tution of this State . . ., or the constitutionality of any law or legislation passed by the General Assembly."[2] It is well within the Justices' discretion to decide whether and to what extent to answer questions the Governor presents.[3] Because we are convinced that your questions touch upon the proper construction of Article II, Section 17 of the Delaware Constitution, we answer your questions (to the extent possible), to better enable you and the General Assembly to discharge your respective constitutional duties to present and enact a balanced budget.

The fact that you have already signed H.S. No. 1 to H.B. 100 does not prevent us from providing an advisory opinion. 10 *Del. C.* § 141(a) contemplates an opinion about "the constitutionality of any law" as well as "legislation passed" (but presumably as yet unsigned). For example, in 1978 the Justices answered a question presented by Governor du Pont concerning legislation that he had already signed.[4] In that case, the Justices recognized the Governor's need to "commit funds and hire personnel."[5] In 1981, the Justices similarly answered a question concerning legislation already signed by Governor du Pont because his request "establishe[d] a need

---

**2.** 10 *Del. C.* § 141(a):

(a) The Justices of the Supreme Court, whenever the Governor of this State or a majority of the members elected to each House may by resolution require it for public information, or to enable them to discharge their duties, may give them their opinions in writing touching the proper construction of any provision in the Constitution of this State, or of the United States, or the constitutionality of any law or legislation passed by the General Assembly, or the constitutionality of any proposed constitutional amendment which shall have been first agreed to by two-thirds of all members elected to each House;

*see also* 29 *Del. C.* § 2102 (authorizing the Governor to seek advisory opinions "whenev-

er the Governor requires it for public information or to enable the Governor to discharge the duties of office with fidelity").

**3.** *See In re Request of Governor for Advisory Opinion*, 722 A.2d 307, 309 (Del.1998).

**4.** *See Opinion of the Justices*, 385 A.2d 695 (Del.1978); *see also, e.g., Opinion of the Justices*, 425 A.2d 604 (Del.1981); *Opinion of the Justices*, 283 A.2d 832 (Del.1971); *Opinion of the Justices*, 233 A.2d 59 (Del.1967); *Opinion of the Justices*, 233 A.2d 59 (Del.1967); *Opinion of the Justices*, 177 A.2d 205 (Del.1962).

**5.** *Opinion of the Justices*, 385 A.2d at 696.

for [an] opinion due to present constitutional duties awaiting performance by the Governor."[6]

In your May 14, 2009 letter renewing your request for our opinions, you advised us that: "Over the next several weeks, the State will begin working with the video lottery agents, potential vendors, and other interested parties to create a sports lottery." You also advised us of your view that the potential revenue generated by a sports lottery is "an important component" of constructing a balanced budget. Therefore, it is clear that our opinions may assist you in committing funds, hiring personnel, and addressing the current budgetary situation.

To determine whether the proposed sports lottery, in whole or in part, constitutes a permissible lottery under Article II, Section 17 of the Delaware Constitution, we must address several subsidiary issues. They are: (1) whether the sports lottery will be under State control; (2) whether it is constitutionally permissible to delegate to the Director of the State Lottery the authority to "provide for the features and attributes" of the sports lottery; (3) whether lotteries, as permitted by the Delaware Constitution, must be games of *pure* chance or *predominately* chance; and finally (4) depending on our answers to those questions, whether the three specific games described in your original letter are constitutionally permissible.

***The Proposed Sports Lottery Will be "Under State Control"***

■ Article II, Section 17(a) of the Delaware Constitution permits "[l]otteries under State control for the purpose of raising funds."[7] Here, we each conclude that the State will control all significant aspects of the sports lottery. As with the currently operating video lottery, the State Lottery Director will control the sports lottery. The Lottery Director will be responsible for determining the "[t]ype and number of sports lottery games to be conducted, the price or prices for any sports lottery games, the rules for any sports lottery games, and the payout and manner of compensation to be paid to winners of sports lottery games." H.S. No. 1 to H.B. 100 requires the Lottery Director to "administer the sports lottery in a manner which will produce the greatest income for the State while minimizing or eliminating the risk of financial loss to the State."

The Lottery Director will oversee the State's purchasing or leasing of all sports lottery machines,[8] which shall appear "exclusively at facilities operated by video lottery agents licensed by the State."[9] As is the case with the video lottery's proceeds, the Lottery Director will manage the daily or weekly transfer of the sports lottery's proceeds to the State Lottery Fund.[10]

The Lottery Director will also oversee the licensing of a risk manager, who "must be a bookmaker currently licensed to operate, and operating, sports books in the United States."[11] The risk manager may

6. *Opinion of the Justices,* 425 A.2d at 605.

7. It is undisputed that the proposed sports lottery is intended to raise funds.

8. H.S. No. 1 to H.B. 100 defines sports lottery machines as "any machine in which bills, coins or tokens are deposited in order to play a sports lottery game. A machine shall be considered a sports lottery machine notwithstanding the use of an electronic credit system

making the deposit of bills, coins or tokens unnecessary."

9. *See id.*

10. *Id.*

11. *Id.* Similarly, the Lottery Director will oversee the sports lottery technology system provider, which "must be licensed to operate lotteries in the United States." *Id.*

be an independent contractor and need not be a State employee. Although the risk manager will be responsible for defining certain crucial aspects of the sports lottery, the State frequently hires outside experts without relinquishing its inherent control. We note that the State already contracts with outside entities in its control and operation of the video lottery.[12]

For the above reasons, we conclude that the sports lottery satisfies the State control requirement found in Article II, Section 17(a) of the Delaware Constitution.

### *H.S. No. 1 to H.B. 100 Does Not Impermissibly Delegate Legislative Power*

■ We further conclude that the sports lottery legislation does not impermissibly delegate legislature power to the Lottery Director.

■ The General Assembly need not spell out every detail concerning the administration of a law.[13] A statute does not unlawfully delegate legislative power, if the statute "establish[es] adequate standards and guidelines for the administration of the declared legislative policy and for the guidance and limitation of those in whom discretion has been vested." [14] This nondelegation principle is intended to prevent "arbitrary and capricious action, and to assure reasonable uniformity in the operation of the law." [15]

We have previously recognized that "[t]he preciseness of the statutory standards will vary with both the complexity of the area at which the legislation is directed and the susceptibility to change of the area in question." [16] It also is well established that, at times, the General Assembly may better achieve its legislative goals by deferring to an administrative agency's greater skill and knowledge.[17] For example, the General Assembly relies on the Department of Natural Resources and Environmental Control to fix and regulate hunting seasons and bag limits as neces-

---

**12.** We rely on the examples provided by counsel presenting the affirmative argument. *See, e.g.,* 29 *Del. C.* § 4805(a)(11) (providing for payment of contracts for "promotional, advertising or operational services"); 29 *Del. C.* § 4805(b)(4) (authorizing the Lottery Director to contract "for the operation of any game or part thereof and ... for the promotion of the game or games"); 29 *Del. C.* § 4820(d) (requiring the Lottery Director to hire an "independent laboratory to test video lottery machines"); 29 *Del. C.* § 4833(d) (the Tri–State Lotto Commission's functions "shall be carried out by ... independent contractors, agents, employees and consultants as may be appointed by the Commission"); *see also* 7 *Del. C.* § 4214 (allowing DNREC to retain "geologists, engineers, or other expert consultants and such assistants"); 4 *Del. C.* § 404 (the Division of Alcohol and Tobacco Enforcement may "engage the services of experts and persons"); 3 *Del. C.* § 904 (authorizing Agricultural Lands Preservation Foundation to "retain by contract auditors, accountants, appraisers, legal counsel, surveyors, private consultants, financial advisors or other contractu-

al services"); 2 *Del. C.* § 1309(7) (authorizing Transportation Authority to "employ consulting engineers, architects, attorneys ... real estate counselors, appraisers, accountants, construction and financial experts, superintendents, managers and such other consultants and employees").

**13.** *See Marta v. Sullivan,* 248 A.2d 608, 609 (Del.1968).

**14.** *Id.; see also Opinion of the Justices,* 425 A.2d at 607.

**15.** *Marta,* 248 A.2d at 609.

**16.** *Atlantis I Condominium Ass'n v. Bryson,* 403 A.2d 711, 713 (Del.1979) (citations omitted).

**17.** *See Raley v. State,* 1991 WL 235357, at *3 (Del.1991) ("[T]he legislature was aware of the difficulties in legislating environmental controls. It simply chose to defer to DNREC's greater skill and knowledge to better accomplish the legislative goals.").

sary to "protect, manage and conserve all forms of protected wildlife of this State." [18]

We conclude that H.S. No. 1 to H.B. 100 does not impermissibly delegate legislative powers to the Lottery Director. In that legislation, the General Assembly established adequate standards and guidelines by requiring the Lottery Director to initiate a sports lottery governed by those rules and regulations that the Lottery Director believes "will produce the greatest income for the State while minimizing or eliminating the risk of financial loss to the State." [19] H.S. No. 1 to H.B. 100 explicitly defines a sports lottery as "a lottery in which the winners are determined based on the outcome of any professional or collegiate event, including racing, held within or without the State, but excluding collegiate sporting events that involve a Delaware college or university and amateur or professional sporting events that involve a Delaware team." [20]

In this case, the scope of the delegation is comparable to the scope of the authority delegated to the Lottery Director over existing State lotteries. In administering the video lottery, the Lottery Director is responsible for determining the "[t]ype and number of games to be conducted," the "[p]rice or prices of tickets for any game," the "[n]umber and sizes of the prizes on the winning tickets," and the "[m]anner of selecting the winning tickets." [21] The General Assembly reasonably deferred to the Lottery Director's skill and knowledge in creating the specific sports lottery games, and no reasons are cited to us creating concern that the Lottery Director would exceed his authority or otherwise act in an arbitrary or capricious manner.

We, therefore, conclude that H.S. No. 1 to H.B. 100 does not impermissibly delegate legislative authority to the Lottery Director.

### The Delaware Constitution Permits Lotteries Involving an Element of Skill

The next issue we must address is whether the fact that the sports lottery involves an element of skill precludes it from being a "lottery" authorized by the Delaware Constitution.

Although Article II, Section 17 authorizes State controlled lotteries, the Delaware Constitution does not define the term "lottery." We are fortunate, however, to have the benefit of analyses by two distinguished Delaware jurists' concerning the meaning of the term "lottery." Then Delaware District Court Judge Walter K. Stapleton addressed this issue in *National Football League v. Governor of the State of Delaware*, where the NFL sought injunctive relief barring Delaware from conducting a lottery based on the NFL's games. [22] Judge Stapleton found "three elements necessary to a lottery: prize, consideration and chance." [23] For reasons discussed below, Judge Stapleton determined that lotteries, as permitted by the Delaware Constitution, need not be matters of pure chance. [24] Rather, the element of chance "may be accompanied by an element of calculation or even of certainty" provided that "chance is the dominant or controlling factor." [25]

---

18. *See* 7 *Del. C.* §§ 102–103.

19. *See* H.S. No. 1 to H.B. 100.

20. *Id.*

21. *See* 29 *Del. C.* § 4805(a).

22. *See generally* 435 F.Supp. 1372 (D.Del. 1977).

23. *Id.* at 1383.

24. *Id.* at 1384–85.

25. *Id.* at 1384.

One year later, Governor du Pont asked the then three Delaware Supreme Court Justices for an advisory opinion addressing whether pool or parimutuel wagering on jai alai exhibitions constitutes a lottery under state control within the constitutional exception.[26] Although Chief Justice Herrmann and Justice Duffy did not address whether the Delaware Constitution authorizes lotteries that involve an element of skill, Justice McNeilly explicitly adopted Judge Stapleton's "cogent analysis" and lottery definition.[27]

In our opinion, Judge Stapleton convincingly and correctly interpreted Article II, Section 17. He described a split of authority concerning whether a lottery may incorporate an element of skill as follows:

> Under the English rule, a lottery consists in the distribution of money or other property by chance, and nothing but chance, that is, by doing that which is equivalent to drawing lots. If merit or skill play any part in determining the distribution, there is no lottery.... In the United States, however, by what appears to be the weight of authority at the present day, it is not necessary that this element of chance be pure chance, but it may be accompanied by an element of calculation or even of certainty; it is sufficient if chance is the dominant

or controlling factor. However, the rule that chance must be the dominant factor is to be taken in the qualitative or causative sense.[28]

Judge Stapleton concluded that "[a]bsent clear language in the Constitution supporting a contrary rule," one should read Article II, Section 17 consistent with the majority, dominant factor rule.[29] Although it is not without significance that a majority of jurisdictions in the United States apply the dominant factor rule, we find Judge Stapleton's historical review of the Delaware legislature's interpretation of the term "lottery" entirely persuasive, independent of any jurisdictional "headcount."

Judge Stapleton explained that, by two separate two-thirds votes in 1972 and 1973 (with an intervening election), the General Assembly amended Article II, Section 17 to authorize State lotteries.[30] He noted that "[t]he same Legislature that gave final approval to the constitutional amendment in its second session in 1974 established the State Lottery and State Lottery Office."[31] "In doing so, it construed the term lottery broadly: ' "Lottery" or "state lottery" or "system" shall mean the public gaming systems or games established and operated pursuant to this chapter and including all types of lotteries.' "[32] Judge Stapleton also determined that " 'Games' or 'gaming' embrace a far wider range of activities than those based on pure chance."[33] Finally, Judge Stapleton noted

26. *See generally Opinion of the Justices,* 385 A.2d 695.

27. *Id.* at 709.

28. *NFL,* 435 F.Supp. at 1383–84 (citations omitted).

29. *Id.* at 1384.

30. *Id.*

31. *Id.* (citation omitted).

32. *Id.* (citing *29 Del. C.* § 4803(b)).

33. *Id.* Judge Stapleton explained:

Black's Law Dictionary 808 (4th ed. 1968) defines games as "a sport, pastime or contest. A contrivance which has for its object to furnish sport, recreation or amusement". The same source defines gaming as follows: An agreement between two or more persons to play together at a game of chance for a stake or wager which is to become the property of the winner, and to which all contribute. "Gaming" and "gambling", in statutes are similar in meaning and either one comprehends the idea that, by a bet, by chance, by some exercise of skill, or by the transpiring of some event unknown until it occurs, something of value is, as the conclusion of premises agreed, to be transferred from a loser to a winner. *Id.* at 1384 n. 22.

that the same legislature that finalized amending Article II, Section 17 "contemplated that some lottery games would be related to or based on sporting events."[34] We agree with and adopt Judge Stapleton's conclusion that "[g]iven the near contemporaneous approval of the lottery amendment and the lottery statute," we should defer to the legislature's interpretation of the term "lottery."

Therefore, we conclude that Article II, Section 17 of the Delaware Constitution authorizes "not only games of pure chance but also games in which chance is the dominant determining factor." [35]

### We Adopt Judge Stapleton's Factual Findings Concerning Parlay Lotteries

In your initial request for our opinions, you described three potential sports lottery games:

(i) Single Game Lottery: Players must select the winning team in any given contest with a line.

(ii) Total Lottery: Players must select whether the total scoring in a game will be over or under the total line.

(iii) Parlay Lottery: Players must select the winning outcome on multiple elements, such as the winner of two or more games, the winner of two or more over-under bets.

Because it is for the Lottery Director to decide the actual structure of the sports lottery's games, we have the benefit of only the above broad descriptions. Because Judge Stapleton addressed these lottery variations after trial and on a complete record, to that extent we adopt, and are able to rely on, his factual findings in arriving at our opinions.

To address the constitutionality of the three specific games comprising Delaware's Scoreboard lottery, Judge Stapleton required six days of evidentiary hearings, presentation of expert testimony, and extensive briefing.[36] Judge Stapleton described those three games, all based on regularly scheduled NFL games, as follows:

In Football Bonus, the fourteen games scheduled for a given weekend are divided into two pools of seven games each. A player must mark the lottery ticket with his or her projections of the winners of the seven games in one or both of the two pools and place a bet of $1, $2, $3, $5 or $10. To win Football Bonus, the player must correctly select the winner of each of the games in a pool. If the player correctly selects the winners of all games in both pools, he or she wins an "All Game Bonus". The amounts of the prizes awarded are determined on a pari-mutuel basis, that is, as a function of the total amount of money bet by all players.

In Touchdown, the lottery card lists the fourteen games for a given week along with three ranges of possible point spreads. The player must select both the winning team and the winning margin in each of three, four or five games. The scale of possible bets is the same as in Bonus and prizes are likewise distributed on a pari-mutuel basis to those who make correct selections for each game on which they bet.

Touchdown II, the third Scoreboard game, was introduced in mid-season and replaced Touchdown for the remainder of the season. In Touchdown II, a "line" or predicted point spread on each of twelve games is published on the

---

**34.** *Id.* at 1384 (citing 29 *Del. C.* § 4805(b)(4)).

**35.** *See id.* at 1385.

**36.** *Id.* at 1376.

Wednesday prior to the games. The player considers the published point spread and selects a team to "beat the line", that is, to do better in the game than the stated point spread. To win, the player must choose correctly with respect to each of from four to twelve games. Depending upon the number of games bet on, there is a fixed payoff of from $10 to $1,200. There is also a consolation prize for those who beat the line on nine out ten, ten out of eleven or eleven out of twelve games.[37]

Judge Stapleton determined that in each of those games, chance is the predominate factor. He noted that the outcome of all NFL games involves an element of chance, citing "the weather, the health and mood of the players and the condition of the playing field."[38] Because the three Scoreboard games required players to select the winners of multiple games, "the element of chance that enters each game is multiplied by a minimum of three and a maximum of fourteen games."[39] Judge Stapleton also determined that "[Touchdown II's] designated point spread or 'line' is designed to equalize the odds on the two teams involved" and "injects a further factor of chance."[40] He found it noteworthy that "[n]one of the games permits head-to-head or single game betting."[41] Despite counsel's stipulation of facts before us, we must emphasize that wide areas of disagreement exist between studies, and internal inconsistencies within studies, addressing single

game betting and the issue of whether chance or skill predominates.

■ Under Judge Stapleton's view of the Scoreboard games, all would be considered parlay lotteries. Because we can and do rely on Judge Stapleton's factual findings, we agree with his conclusion that chance is the dominant factor in parlay lotteries, which require players to select the winners of two or more games.[42]

■ That said, because we lack the benefit of actual evidence concerning single game bets and the extent to which "the line" introduces chance and causes it to predominate over skill or merely manages the money flow, we cannot opine on the constitutionality of single game bets.

### CONCLUSION

Recognizing the difficulties that you and the General Assembly face in presenting a balanced budget for fiscal year 2010, we have attempted to answer your questions to the fullest extent possible. In our opinion, the sports lottery, as defined by H.S. No. 1 to H.B. 100, satisfies the State control requirement of Article II, Section 17 and does not impermissibly delegate legislative authority to the Lottery Director.[43] We further conclude that the Delaware Constitution allows lotteries to involve an element of skill, but only where chance predominates. Without specific details of the exact nature of an interplay of sports betting options, however, all that we can

37. *Id.*

38. *Id.* at 1385.

39. *Id.*

40. *Id.*

41. *Id.* at 1385.

42. Logic suggests little meaningful distinction between a parlay lottery of two as opposed to three games. It is the single bet that raises

factual issues about whether skill or chance predominates, and the role of the "line."

43. Because Opinions of the Justices "do not arise in a case or controversy, and are not an opinion of the Supreme Court ... they are not binding in later litigation." *See In re Request of Governor for Advisory Opinion,* 722 A.2d 307, 309 (Del.1998).

currently opine is that the Lottery Director's designed games must assure that chance is the predominant factor.

/s/Myron T. Steele Myron T. Steele, Chief Justice

/s/Randy J. Holland Randy J. Holland, Justice

/s/Carolyn Berger Carolyn Berger, Justice

/s/Jack B. Jacobs Jack B. Jacobs, Justice

/s/Henry DuPont Ridgley Henry DuPont Ridgley, Justice